IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 5, 2014 Session

**STATE OF TENNESSEE v. MARLO DAVIS**

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 07-01813    Mark Ward, Judge**

_____

**No. W2011-01548-SC-R11-CD - Filed June 3, 2015**

_____

The Defendant, Marlo Davis, was charged with alternative counts of first degree felony murder and first degree premeditated murder.  The jury convicted the Defendant of second degree murder as a lesser-included offense of felony murder and of reckless homicide as a lesser-included offense of premeditated murder.  The trial court subsequently merged the reckless homicide conviction into the second degree murder conviction and sentenced the Defendant as a Range II offender to forty years' imprisonment.  The Court of Criminal Appeals affirmed.  We granted the Defendant permission to appeal and now address three issues: (1) whether the trial court committed reversible error by admitting as substantive evidence a prior statement and the preliminary hearing testimony of a testifying witness; (2) whether the evidence was sufficient to support the Defendant's alternative convictions of second degree murder and reckless homicide; and (3) whether the jury's inconsistent verdicts entitle the Defendant to relief.  We hold that the trial court's admission of the testifying witness' prior statement and preliminary hearing testimony was not reversible error and that the evidence was sufficient to support the Defendant's convictions.  We also reject the Defendant's argument that the jury's inconsistent verdicts entitle him to relief.  Accordingly, we affirm the trial court's judgment of second degree murder.

**Tenn. R. App. P. 11 Appeal by Permission;
Judgment of the Court of Criminal Appeals Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, GARY R. WADE, and HOLLY KIRBY, JJ., joined.  SHARON G. LEE, C.J., filed a concurring opinion.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Marlo Davis.

1

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; Leslie E. Price, Senior Counsel; William L. Gibbons, District Attorney General; and David Zak and Stephanie Johnson, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant and his co-defendant, Latarius Sawyer, were charged jointly with alternative counts of first degree felony murder and first degree premeditated murder after Quincy Jones, the victim, was shot to death in Memphis, Shelby County, Tennessee, in 2006. Both the Defendant and Sawyer were tried together before a jury in April 2011.

To assist in understanding the circumstances surrounding the victim's homicide, we first will describe briefly the physical locations pertinent to this case. The victim's house, 1600 Ely, was located on the corner of Essex and Ely. Essex was intersected by Ely to the west and by Miller to the east. The victim's house faced Ely, and Essex ran alongside the victim's house. Directly behind the victim's house, facing Miller, was witness Ella Renee Conyer's house at 1599 Miller. The back yards of the victim's house and Conyer's house abutted one another. Diagonally across Essex from the victim's house was witness Laraine Bobo's residence, 1607 Ely. Directly across Essex from the victim's house was a church.

The proof adduced at the jury trial established that the victim owned rental properties in Shelby County, Tennessee, including the one located at 1600 Ely on the corner of Ely and Essex. The victim was in the process of refurbishing this property in November 2006, and, on November 9, 2006, drove his Range Rover to the property at about 3:00 p.m.

On that day, Laraine Bobo was in the driveway of her home waiting for her grandchildren to come home from school. She testified that it was "a sunny, beautiful day." She saw Clarence Bailey, whose nickname was "Dusty," walking along Essex. Dusty turned and walked up to the victim's property and knocked on the front door. No one answered, and Dusty turned around and walked back the way he had come. Bobo also saw Sawyer standing nearby with "a tall young man" wearing a hooded jacket with the hood up. Because of the hood, Bobo could not see the man's face.

As Bobo saw her grandchildren coming down the street, she heard an argument break out. She did not know where the speakers were, but she was afraid that something was going to happen, so she yelled at her grandchildren to hurry. She then heard "a big boom, a gunshot." Bobo continued trying to hurry the children into her house. She saw a "strange-

2

looking man" coming toward her and then realized that it was the victim. The victim walked up to her and asked her to call 911. She asked the victim if he had been shot, and the victim nodded. Bobo called 911, and the recording of Bobo's 911 call was played for the jury.

The victim fell face down on Bobo's driveway. Bobo and another person turned the victim over, and Bobo saw that the victim had been shot in the right side of his abdomen. In addition to calling 911, Bobo flagged down a passing police car. Bobo later identified Sawyer, Sawyer's brother, and Bailey from photographic arrays. Bobo acknowledged that she had not recognized any of the raised voices that she had heard.

Officer Cedric Curry of the Memphis Police Department ("MPD") was the first officer at the crime scene, arriving at approximately 3:30 or 3:35 p.m. He found the unresponsive victim lying in the driveway of the residence at 1607 Ely. As part of his effort to secure the scene, he placed a witness by the name of Richardson in the back of his patrol car. Officer Curry did not speak with Bobo at the scene.

Camry Richardson testified that she was fifteen years old on November 9, 2006. At the time, she was living in the Ely and Essex neighborhood. As she was walking home from school that day, Richardson saw the victim having a conversation with two men. She did not hear what was said and did not see the faces of the two men talking to the victim. Richardson stated that the two men were black and that both were wearing dark blue jeans. One of the men was wearing a hoodie.

Several seconds after seeing the three men conversing, Richardson heard a gunshot. She then saw the victim running toward Ely, "hunched over holding his stomach." The other two men "were running through the cut on Miller Street."

On cross-examination, Richardson explained that the three men had been standing on Essex, with the victim on the sidewalk and the other two men in the street. She stated that all three men were on the "church side" of Essex. The conversation did not appear to be an argument. Richardson did not see any of the men with a gun. The man wearing the hoodie had the hood down around his neck. Richardson stated that she knew the Defendant's and Sawyer's faces. She stated that, after the gunshot, the two men that had been talking to the victim ran off separately. The man wearing the hoodie ran toward Miller. Richardson did not remember the direction in which the other man ran, but she stated that it was in a different direction. Richardson did not see any weapons as the men ran away.

Ella Renee Conyers testified that she was driving home on the afternoon of November 9, 2006, and as she was driving east on Essex approaching the intersection with Ely, she noticed someone on the front porch of the victim's house. This person was looking in the

3

front door. As she drove past the back yards behind the victim's house and her house, she saw someone crouched behind her other car, which was parked in her back yard. This man stood up when he noticed her looking at him, but she did not recognize him. She turned the corner and parked on Miller in front of her house. As she parked, she noticed another man she did not recognize watching her from across the street and near the church. She got out of her car and went into her house. A "[v]ery short time" after she went inside, she heard a gunshot and a "loud shout." She went into her backyard and "noticed the commotion on the corner." She learned that the victim had been shot.

By stipulation, Clarence Bailey testified by video deposition. Bailey, born in 1970, testified that he was a cocaine addict and that he had been "eating" cocaine on November 9, 2006. He also explained that he had a metal plate across his forehead that affected his ability to remember. Bailey acknowledged that, as of the time of his deposition, he was in custody on charges of domestic assault and aggravated burglary. He also was facing a first degree murder charge in Texas. Previously, he had pleaded guilty to attempted aggravated burglary and aggravated assault.

Bailey testified that, on November 9, 2006, he was walking around the Ely/Essex neighborhood looking for odd jobs to make enough money to buy more cocaine. As he was walking west on Essex at approximately 3:00 p.m., he passed Conyer's house and saw an older model car parked in her backyard. He also saw a Range Rover parked behind the victim's house, next to Conyer's car. Stooped over near Conyer's car, Bailey saw Sawyer. Stooped over near the Range Rover, Bailey saw the Defendant. Bailey did not see the men doing anything suspicious. Bailey testified that he had known both the Defendant and Sawyer since they were small children.

Because Bailey knew that the victim's house was vacant, the Range Rover's presence caused him to think that there might be some work being done on the house. He decided to inquire if there was a job available, so he walked to the corner of Essex and Ely, turned right onto Ely, and walked up the steps to the front door of the victim's house. The storm door was closed, but the main door was open. He knocked on the door, but no one answered. Since Bailey saw no one inside, he left and began walking back down Essex, headed east. Bailey added that, while he was on the porch, he saw a white car being driven by a woman pass by slowly while headed east on Essex. The driver was watching something to Bailey's left and looked "dead in [his] face."

Because school had just let out and there were many children about, Bailey walked away down the middle of Essex. As he was approaching the corner of Essex and Miller, he heard a "commotion" that he described as two men arguing. He looked over and saw the Defendant speaking with another man that he did not recognize. This conversation was

4

occurring near the Range Rover. Bailey also saw Sawyer in the vicinity, but he did not know if Sawyer was "together" with the Defendant. The Defendant and Sawyer were both wearing hoodies. Bailey continued walking and, "before [he] g[o]t about twenty steps away," he heard a gunshot. Bailey did not turn around to see what had happened but began running from the area. Bailey clarified that about fifteen to twenty seconds passed after he heard the commotion until he heard the gunshot.

Bailey subsequently was picked up by the police on two occasions and questioned about the victim's homicide. Bailey gave two written statements to the police about what he had witnessed, the first on November 11, 2006, and the second on November 12, 2006. Bailey acknowledged that his second statement contained information about his presence at the scene that he had omitted from his first statement. During his deposition, Bailey denied that he had consumed any cocaine before speaking with the police.

On cross-examination, Bailey denied owing the Defendant any money. He stated that he had a "problem" with the Defendant in July 2009, but he previously had not had any problems with the Defendant.

Demetrius Holloway, fifteen years old at the time of trial, testified that Jarcquise Spencer was his cousin. On November 9, 2006, at approximately 3:15 p.m., Holloway was walking home from school with Spencer and Spencer's little sister. They were walking along Essex to Bobo's house where Spencer lived. As he was walking, Holloway noticed "two dudes sitting down" near a church. As Holloway and Spencer passed the men, Spencer spoke to them and shook hands with one of the men. Holloway did not recognize either man.

As Holloway and Spencer continued to walk, the two men crossed the street. When Holloway heard arguing, he looked back. He saw the man wearing a hoodie pull out a gun. Seeing the gun, Holloway ran. As he ran, Holloway heard a gunshot. Holloway ran into Bobo's house. When Holloway went back outside, he saw the victim lying in the driveway holding his stomach. Holloway did not see where the two men went.

On cross-examination, Holloway stated that he was two years older than Spencer. He also explained that, when he began running after seeing the gun, Spencer waited a short time before he began running. When Holloway arrived at Bobo's house, Bobo was standing on the porch.

Holloway denied seeing anyone crouched behind a car. He did not see anyone knocking on the front door of the victim's house. He did not see the entire gun but only the "back part" as it was "getting ready to be pulled out." Before Holloway saw the gun, he saw

5

the two men standing near the victim, who was standing near his SUV in the back yard of his property.

Jarcquise Spencer testified that he was presently fifteen years old and in the eighth grade. Asked about the events of November 9, 2006, he stated that he could not remember walking home from school or hearing any gunshots. He recalled the victim lying bleeding in his grandmother's driveway, and he recalled getting his grandmother a towel. He stated that he did not recall talking to the police or looking at photographic spreads. He did not remember testifying at the preliminary hearing.

The State played the recording of Spencer's preliminary hearing testimony, and the recording was admitted into evidence. At the hearing, Spencer testified that, as he was walking home from school with David and Demetrius Holloway on November 9, 2006, he saw the Defendant and Sawyer sitting on a brick wall by the church. The Defendant was wearing a brown hoodie. Spencer then saw the Defendant and Sawyer cross the street and approach the victim behind the victim's house. As Spencer was standing across the street looking into the victim's back yard at the three men, he saw the Defendant pull a gun, and he heard the Defendant tell the victim to "give it to him." The victim raised his hands and said, "Please don't do this to me." Spencer then saw the Defendant point his gun at the victim and shoot him. Spencer testified that he saw the Defendant use his right hand to pull the gun out of the front pocket of the hoodie the Defendant was wearing.

Spencer testified that he did not hear Sawyer say anything and that Sawyer was standing next to the Defendant with his arms folded when the Defendant shot the victim. The victim ran across the street to Spencer's grandmother's house after he was shot. The Defendant and Sawyer also ran from the scene, but Spencer did not see where they ran.

Spencer identified the Defendant and Sawyer at the preliminary hearing. Spencer also stated that, right before the shooting, he saw "Dusty" walk up to the victim's front door. Dusty was walking away when the shooting occurred.

While Spencer was watching the Defendant, Sawyer, and the victim, Demetrius Holloway was standing next to him. David Holloway had gone ahead and was yelling at them to "come on." Spencer stated that his grandmother was on her porch at the time of the shooting.

After listening to his preliminary hearing testimony at trial, Spencer continued to deny any recollection of his previous testimony. He acknowledged knowing the Defendant and Sawyer, and he identified them at trial. Shown his written statement to the police, dated November 14, 2006, Spencer identified it as his own but denied any recollection of what he

had stated. The prosecutor then read aloud each question in the statement, and Spencer read aloud each answer.[1]

In his statement, Spencer claimed that he saw the Defendant shoot the victim with a gun that the Defendant held in his right hand. Sawyer was with the Defendant. The Defendant told the victim, "Give it to me!" and the victim responded, "No don't do me like this!" The victim had his arms raised up. Sawyer did not say anything but just stood there beside the Defendant. Spencer saw one gunshot. He did not see where the Defendant or Sawyer went after the shooting. The Defendant had been wearing a brown hoodie with the hood up. Sawyer was wearing a black shirt and blue jeans.

Asked by the police officer taking his statement to narrate what he had seen, Spencer answered as follows:

> Quincy was working on the house outside. He was bringing water in the house. Then I saw them walking over there. They was playing it off saying, "Is all four of them houses your[s]?" and he was like "Naw." Then I saw them walking over there and then Marlo pulled out the gun and [Sawyer] was like this (stands with his arms folded across his chest), just standing there. Then I saw Marlo shoot Quincy and Quincy he ran to my grandmas. He was like walking like that (holds his right side and stoops over like he is falling down) trying to catch his balance. And then, my grandmomma was telling us to come on, come on. And then Quincy, he fell in our driveway. And then my grandmomma had told me to get a towel. Then he told my grandmomma to call 911. [T]hen the polices [sic] came, and the ambulance.[2]

In conjunction with giving his statement, Spencer also marked his location and that of the Defendant, Sawyer, the victim, and Dusty on a hand-drawn map of the scene. This drawing was admitted into evidence. Spencer also identified Dusty, the Defendant, and Sawyer from photographic arrays on November 13, 2006, and these identifications were admitted into evidence. Under his identification of Dusty, Spencer wrote, "I saw him walking." Under his identification of the Defendant, Spencer wrote, "Marlo he pointed the gun at him Quincy." Under his identification of Sawyer, Spencer wrote, "[H]e was with the

---

[1] The trial court also admitted the written statement itself into evidence.

[2] The police officer who took Spencer's statement acknowledged during his testimony that he had added the parenthetical statements in order to describe Spencer's actions while Spencer was giving his statement.

man that pointed the gun." At trial, Spencer acknowledged his handwriting on the arrays but denied any recollection of the arrays.

Spencer denied at trial that he had been threatened or promised anything. He denied that anyone had talked to him about his testimony. Asked about his memory loss, Spencer stated, "I just don't remember."

Officer Alisa Mitchell of the MPD reported to the crime scene, took photographs of the area, and prepared a diagram, all of which were admitted into evidence. She and another crime scene officer searched the area with a metal detector but did not recover any shell casings. Several latent finger and palm prints were recovered.

Sergeant Anthony Mullins of the MPD reported to the scene and spoke with Bobo. He also took Spencer's statement and showed Spencer four photographic arrays.

Dr. Karen Elizabeth Chancellor, the Chief Medical Examiner for Shelby County, testified that she performed an autopsy on the victim. She opined that the cause of death was a single gunshot wound to the victim's abdomen, "most[] likely a handgun wound." She recovered the lethal bullet from the victim's body. She also swabbed the victim's hands for gunshot residue and turned the swabs over to the laboratory for analysis.

Sergeant John M. Oliver of the MPD testified that the finger and palm prints collected from the scene did not match the Defendant or Sawyer. The gunshot residue swabs taken from the victim's hands tested positive for gunshot residue, indicating that the victim had been in close proximity to the gun when it was fired.

The State rested its case-in-chief after Sgt. Oliver's testimony, and the defense presented no proof. Relevant to the issues before us, the trial court charged the jury as follows:

> In reaching your verdict, you shall first consider the offense charged in the first count of the indictment, first-degree murder in the perpetration of attempted robbery. If you find the Defendant guilty of that offense beyond a reasonable doubt, you shall return a verdict of guilty for that offense.

> If you unanimously find the Defendant not guilty of that offense or have a reasonable doubt of the Defendant's guilt of that offense, you shall then proceed to consider whether or not the Defendant is guilty of the next lesser-included offense in order from greatest to least. You shall not proceed to consider any lesser-included offense until you have first made a unanimous

8

determination that the Defendant is not guilty of the immediately preceding greater offense or you unanimously have a reasonable doubt of the Defendant's guilt of that offense.

. . . .

The charged offense in the first count of the indictment is first-degree murder in the perpetration of attempted robbery. The lesser-included offenses in order of consideration from first to last are as follows:

A. Facilitation of first degree murder in the perpetration of attempted robbery;

B. Second degree murder;

C. Facilitation of second degree murder;

D. Voluntary manslaughter;

E. Facilitation of voluntary manslaughter;

F. Reckless homicide;

G. Facilitation of reckless homicide;

H. Criminally negligent homicide;

[I.] Facilitation of criminally negligent homicide.

The charged offense in the second count of the indictment is premeditated first degree murder. The lesser-included offenses in order of consideration from first to last are as follows:

A. Facilitation of premeditated first degree murder;

B. Second degree murder;

C. Facilitation of second degree murder;

D. Voluntary manslaughter;

9

E.  Facilitation of voluntary manslaughter;

F.  Reckless homicide;

G.  Facilitation of reckless homicide;

H.  Criminally negligent homicide;

[I.]  Facilitation of criminally negligent homicide.

When you retire to consider your verdict in the first count of the indictment, you will first [in]quire whether the Defendants, or either of them, are guilty of first degree murder in the perpetration of attempted robbery as charged in the first count of the indictment.

If you find beyond a reasonable doubt that the Defendants, or either of them, are guilty of this offense, your verdict will be, "We, the jury, find the Defendants, or either of them, naming such Defendant or Defendants, guilty of first degree murder in the perpetration of attempted robbery as charged in the first count of the indictment."

If you find the Defendants, or either of them, not guilty of this offense or if you have a reasonable doubt of their guilt of this offense, you will acquit them, or either of them, thereof and then proceed to inquire whether they or either of them are guilty of the lesser-included offenses in order of consideration from greatest to last–to least, as previously indicated.

If you find beyond a reasonable doubt the Defendants, or either of them, guilty of the lesser-included offense, your verdict will be, "We, the jury, find the Defendants, or either of them, naming such Defendant or Defendants, guilty of blank, as included in the first count of the indictment." Insert in said blank the lesser-included offense.

If you find the Defendants, or either of them, guilty on the first count of the indictment, you may convict them, or either of them, of only one of the above-named offenses charged and included in the first count of the indictment.

. . . .

10

When you retire to consider your verdict in the second count of the indictment, you will first inquire whether the Defendants, or either of them, are guilty of premeditated first degree murder as charged in the second count of the indictment.

If you find beyond a reasonable doubt that the Defendants, or either of them, are guilty of this offense, your verdict will be, "We, the jury, find the Defendants, or either of them, naming such Defendant or Defendants, guilty of premeditated first degree murder as charged in the second count of the indictment."

If you find the Defendants, or either of them, not guilty of this offense or if you have a reasonable doubt of their guilt of this offense, you will acquit them, or either of them, thereof and then proceed to inquire whether they, or either of them, are guilty of the lesser-included offenses in order of consideration from greatest to least, as previously indicated.

If you find beyond a reasonable doubt the Defendants, or either of them, guilty of a lesser-included offense, your verdict will be, "We, the jury, find the Defendants, or either of them, naming such Defendant or Defendants, guilty of blank, as included in the second count of the indictment." Insert in said blank the lesser-included offense.

If you find the Defendants, or either of them, guilty on the second count of the indictment, you may convict them, or either of them, of only one of the above-named offenses charged and included in the second count of the indictment.

The trial court also instructed the jury that "'[k]nowingly' means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim" and that

"Recklessly" means that a person acts recklessly when the person is aware of but consciously disregards a substantial and unjustifiable risk that the alleged victim will be killed. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

11

The requirement of recklessly is also established if it's shown the Defendant acted . . . knowingly.

After deliberating, the jury acquitted the Defendant of first degree felony murder and facilitation of first degree felony murder as charged in the first count but convicted him of second degree murder as a lesser-included offense. As to the second count of the indictment, the jury acquitted the Defendant of first degree premeditated murder, facilitation of first degree premeditated murder, second degree murder, facilitation of second degree murder, voluntary manslaughter, and facilitation of voluntary manslaughter. The jury convicted the Defendant of the lesser-included offense of reckless homicide on the second count of the indictment. The jury acquitted Sawyer of all charges. After a sentencing hearing, the trial court merged the reckless homicide conviction into the second degree murder conviction and sentenced the Defendant as a multiple Range II offender to forty years of imprisonment.

The Defendant appealed his convictions and sentence, and the Court of Criminal Appeals affirmed. See State v. Davis, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, at *1 (Tenn. Crim. App. May 21, 2013). We granted this appeal to address the Defendant's contentions that the trial court committed reversible error by admitting Spencer's statement to the police and his preliminary hearing testimony as substantive proof; that the proof was not sufficient to support his convictions; and that "[t]he verdicts found by the jury were mutually exclusive verdicts, and therefore the second-degree charge should be merged into the [r]eckless [h]omicide to prevent a [d]ouble [j]eopardy violation."[3]

*Admission of Spencer's Written Statement and Prior Testimony*

During the investigation phase of this case, Spencer provided a written statement to the police ("the written statement"). Later, after the Defendant's arrest, Spencer testified at the preliminary hearing ("the prior testimony"). On each of these prior occasions, Spencer claimed to have seen the Defendant pull a gun and shoot the victim. At trial, Spencer maintained that he had no recollection of seeing the victim get shot. Over the Defendant's objection, the trial court admitted both the written statement and the prior testimony as substantive evidence.

---

[3] In his application for permission to appeal to this Court, the Defendant also raised an issue about his sentence. The Defendant did not pursue this issue in his supplemental brief to this Court after permission to appeal was granted. Indeed, the Defendant asserted in his supplemental brief that he was raising only the three issues identified above. Therefore, we decline to address the sentencing issue referred to in the Defendant's application for permission to appeal.

The Defendant asserts that these rulings were reversible error. Generally, this Court reviews a trial court's decisions regarding the admissibility of evidence for an abuse of discretion. See State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014) (citing State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008)).

Initially, we acknowledge that both the written statement and the prior testimony were hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay generally is not admissible. Tenn. R. Evid. 802. Our rules of evidence provide for the admission of hearsay statements, however, pursuant to the exceptions set forth in Rules 803 and 804.

The trial court admitted the written statement under Tennessee Rules of Evidence 803(5) (recorded recollection) and 803(26) (prior inconsistent statement of a testifying witness). The trial court admitted the prior testimony under Tennessee Rules of Evidence 803(26) and 804(b)(1) (former testimony of a currently unavailable witness). The trial court also determined that both the written statement and the prior testimony satisfied the criteria of Tennessee Rules of Evidence 612 and 613.[4]

<u>Admission of Written Statement Pursuant to Rule 803(5)</u>

The Defendant contends first that the trial court erred in admitting the written statement pursuant to Tennessee Rule of Evidence 803(5), which provides for the admission of the following hearsay:

A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge

---

[4] Tennessee Rule of Evidence Rule 612 addresses the circumstances in which a writing may be used to refresh a witness' memory. Tennessee Rule of Evidence 613 addresses the circumstances in which a witness may be examined about a prior statement.

correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Tenn. R. Evid. 803(5).[5]

Rule 803(5) has several prerequisites that must be satisfied before a prior recorded recollection may be admitted as substantive evidence. The party seeking admission of the prior statement must:

(1) provide a memorandum or record; (2) about a matter that the witness once had knowledge of; (3) establish that the witness now has insufficient recollection to testify fully and accurately; (4) that the statement was made or adopted by the witness; (5) while fresh in the witness's memory, and; (6) that the record accurately reflects the witness's knowledge.

Mitchell v. Archibald, 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998) (footnote omitted); see also State v. Mathis, 969 S.W.2d 418, 421-22 (Tenn. Crim. App. 1997); Neil P. Cohen, et al., Tennessee Law of Evidence § 8.10[3] (6th ed. 2011) (hereinafter "Cohen").

In this case, the State produced Spencer's written statement provided to the police. Spencer identified the statement as his, and he affirmed that he was truthful with the police at the time. Spencer consistently maintained that he could not remember the events in question. During the jury-out hearing, Officer Mullins testified that, when he took Spencer's statement, Spencer "answered [his] questions very easily." Officer Mullins added, "This was a very fresh event. It had only been a period of a couple of days maybe. [Spencer] didn't seem to have any trouble answering the questions, and he didn't seem to hesitate at all. He seemed to know exactly what he was talking about." When asked if Spencer seemed able to discern the difference between the truth and a lie, Officer Mullins responded, "He seemed to. He seemed to be a very bright young man, and the impression I got was he was just telling me what he saw. He didn't know to do anything different except just to tell me what he saw."

---

[5] As set forth above, the trial court admitted the contents of the written statement in two formats, both as substantive evidence. First, the prosecutor read aloud each question in the written statement to Spencer while Spencer was testifying, and Spencer read aloud each answer. Second, the trial court admitted the written document itself during Spencer's testimony. The document was admitted at the State's request. Because Spencer was testifying for the State, the document should not have been received as an exhibit under Rule 803(5) because it was not offered by an adverse party. However, defense counsel did not object at trial to the admission of the document on this basis. Moreover, the Defendant has not raised this issue to this Court. Accordingly, this issue is waived. See State v. Bishop, 431 S.W.3d 22, 43 (Tenn. 2014).

14

As to the State's satisfaction of the criteria for the admission of a recorded recollection, the Defendant asserts only that Spencer did not have an "insufficient recollection" but, instead, was merely feigning his memory loss.

Our Rules of Evidence do not provide a definition of "insufficient recollection." Neither the Defendant nor the State refers to any Tennessee cases addressing whether a witness' claimed lack of recollection must somehow be legitimatized, and we have found none.  However, both the United States Court of Appeals for the Sixth Circuit and the Pennsylvania Supreme Court have addressed this issue within the context of a similar rule of evidence, and both courts have determined that a feigned memory loss will not defeat the admissibility of the prior recorded recollection.  See United States v. Porter, 986 F.2d 1014, 1017 (6th Cir. 1993); United States v. Williams, 571 F.2d 344, 349 (6th Cir. 1978); Commonwealth v. Cargo, 444 A.2d 639, 642-45 (Penn. 1982); Commonwealth v. Shaw, 431 A.2d 897, 899-900 (Penn. 1981).  We are persuaded that this is the correct approach.

First, there simply is no definitive objective test that a trial court can utilize to determine whether a witness is being truthful about his or her memory loss.  Moreover, although a trial judge may have sufficient information to support a finding that a witness is exaggerating his or her difficulties in recalling events, Rule 803(5) does not require such a finding.  Second, the purpose of Rule 803(5) is to permit the admission of hearsay that is deemed sufficiently trustworthy to assist the trier of fact in determining the facts of the case. See Cohen § 8.01[3][c] (recognizing that hearsay is frequently admitted because "the evidence is needed to provide the trier of fact with critical information").  Disallowing a contemporaneous statement made under conditions that indicate the statement's trustworthiness because the author of the statement later may be exaggerating his or her memory loss, perhaps out of fear of reprisal, would defeat the purpose of the Rule and hamper the truth-finding function of the trial.  Accordingly, we hold that a suspicion that a witness is exaggerating his or her memory loss at trial is not sufficient to abrogate the admissibility of a recorded recollection pursuant to Rule 803(5).  The Defendant is not entitled to relief on this basis.

### Admission of Written Statement and Prior Testimony Pursuant to Rule 803(26)

The Defendant next complains that the trial court committed reversible error in admitting Spencer's written statement and prior testimony as substantive evidence under Tennessee Rule of Evidence 803(26).  This provision for the admission of hearsay provides

that a testifying witness' prior inconsistent statement "otherwise admissible under Rule 613(b)"[6] is admissible as substantive evidence if all of the following conditions are satisfied:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26). Additionally, the 2009 Advisory Commission Comment to this provision provides as follows:

> Subsection (26) alters Tennessee law by permitting some prior inconsistent statements to be treated as substantive evidence. Many other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example. This rule incorporates several safeguards to assure that the prior inconsistent statements are both reliable and authentic.

> To be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613. This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.

Tenn. R. Evid. 803(26) advisory commission cmt. (2009).

The Defendant contends in his brief to this Court that Spencer's written statement and prior testimony do not qualify as prior inconsistent statements, asserting that "the lack of memory or feigning of memory loss is the absence of any statement, but is not inconsistent."

---

[6] Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b).

16

That is, because Spencer offered no substantive statements at trial, his prior statements could not be "inconsistent." The State disagrees.

We hold that, for the purposes of Tennessee Rule of Evidence 803(26), a prior statement about events that a witness claims at trial to be unable to remember is "inconsistent" with the witness' trial testimony. Indeed, the Advisory Commission Comment specifically includes as an example a witness who asserts a lack of recollection at trial. That witness' prior statement is, for the purposes of the Rule, inconsistent. This comports with common sense: A prior statement relating particular facts is certainly not *consistent* with a subsequent lack of recollection. Accordingly, we will not construe "inconsistent" so narrowly as to require accounts that differ in their recitation of the facts. Moreover, this holding is in accord with decisions construing the meaning of "inconsistent" in Tennessee Rule of Evidence 613(b), which, under certain circumstances, allows a party to impeach a witness with extrinsic evidence of prior inconsistent statements. See, e.g., State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998) (indicating that a prior statement is inconsistent for the purposes of Rule 613(b) when the witness at trial denies or equivocates about having made the statement); see also State v. Kendricks, 947 S.W.2d 875, 882 (Tenn. Crim. App. 1996) (stating that, if a witness does not recall making a statement, the prior statement can be used to impeach the witness); Cohen § 6.13[3] (noting that "evasive answers at trial may make an earlier statement inconsistent with the trial testimony").

We also hold that a trial court's suspicion that the trial witness' claim of memory loss is feigned or exaggerated does not defeat the inconsistent nature of the prior statement. As set forth above, trial courts lack the tools to determine conclusively whether a witness is being entirely honest about the extent of his or her recollection. Moreover, for the same reasons set forth above, a claim of memory loss should not serve to impede the truth-seeking function of a trial or the applicability of our Rules of Evidence. The Defendant is not entitled to relief on this basis.

Admission of Prior Testimony Pursuant to Rule 804(b)(1)

The Defendant next contends that the trial court erred in admitting Spencer's preliminary hearing testimony under one of the hearsay exceptions for unavailable witnesses. See Tenn. R. Evid. 804(b)(1) (permitting the admission of prior testimony by an unavailable witness "if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination"). The Defendant argues that the trial court erred in finding that Spencer was "unavailable."

Our Rules of Evidence provide that a witness is "unavailable" if he or she "demonstrates a lack of memory of the subject matter of [his or her] [prior] statement."

17

Tenn. R. Evid. 804(a)(3). In this case, the trial court concluded that Spencer met this criterion. The Defendant argues that Spencer, in fact, did not demonstrate an actual *lack* of memory but was simply feigning his memory loss. The Defendant asserts that a feigned memory loss does not qualify a witness as "unavailable."

According to one of Tennessee's leading treatises on evidence,

[i]f the [trial] court does not believe that the witness really does lack memory, the best approach may be for the court to order the witness to testify. If the witness still feigns lack of memory, the witness would be unavailable under Rule 804(a)(2) for persisting to refuse to testify despite a court order to do so.

Cohen at § 8.33[6]. We agree that this is a prudent approach. A trial judge who suspects that a witness may be feigning or exaggerating his or her inability to recollect the relevant matters should utilize this approach.

In this case, the trial court technically did not order Spencer to testify. Nevertheless, we hold that, to the extent the trial court's approach possibly could be considered error, any error in failing to technically order Spencer to testify clearly was harmless. Our close review of the record reveals that, when Spencer was initially called to the stand and while the jury was out, the trial judge asked Spencer, "Do you understand this is a court of law, and if you're called as a witness in this case, you will take an oath to tell the truth, and even if you don't want to tell the truth, you've got to tell the truth. You have to answer all the questions that all the lawyers ask of you." Spencer responded, "Yes, sir." The trial court then asked, "Do you understand that? Are you willing to tell the truth?" Spencer again answered in the affirmative. When the prosecutor then began asking Spencer questions, still with the jury out, Spencer repeatedly responded that he did not remember the day or events in question. Eventually, the trial court interrupted and the following colloquy ensued:

THE COURT: What [the prosecutor is] asking you, sir, is are you a liar?

THE WITNESS: No, sir.

THE COURT: When you give statements to the police officers, do you lie to them?

THE WITNESS: No, sir.

THE COURT: When you come into court and take an oath to tell the truth, do you lie in court?

18

THE WITNESS:  No, sir.

THE COURT:  Why are you having trouble answering his questions?

THE WITNESS:  I'm not having any question–I mean I'm not having any problem.

THE COURT:  Well, it looks like to me you're having problems, sir.  All you're up here doing is saying, "I don't remember."  Do you remember coming down and lying intentionally when you made a statement?

THE WITNESS:  No, sir.

THE COURT:  You're not a liar, are you?

THE WITNESS:  No, sir.

THE COURT:  When you say you don't remember coming to the preliminary hearing, are you really–I'm having a hard time understanding what you're saying.  You're in the eighth grade?

THE WITNESS:  Yes, sir.

THE COURT:  Are you in special resource classes?

THE WITNESS:  No, sir.

THE COURT:  You don't have any mental problems?

THE WITNESS:  No, sir.

THE COURT:  What kind of grades do you make?

THE WITNESS:  C's.

THE COURT:  C's.  And you take regular classes with every other child in school?

THE WITNESS: Yes, sir.

THE COURT:  And you know the difference between telling the truth and telling a lie?

THE WITNESS:  Yes, sir.

THE COURT:  Which one are you supposed to do, tell the truth or tell a lie?

THE WITNESS:  Tell the truth.

THE COURT: When you say you don't remember the preliminary hearing, are you saying you don't remember word for word what you said?  Is that what you're trying to say, or are you trying to say you don't ever remember coming to 201 Poplar?

THE WITNESS:  I really don't remember because it happened so long ago I don't remember.

The prosecutor then resumed asking Spencer questions, and Spencer continued his claim of no memory.  The prosecutor then stated the following:

This is what I'm talking about, Your Honor.  I'm not sure if the Court wants to hold him in contempt and sen[d] him to Juvenile Court tonight or if they want to put the mother in because I think it's the mom, but it's obvious to everyone sitting here that he is absolutely, positively not telling the truth right now.  He is using this fake memory loss as an excuse.

Spencer interjected, "I'm telling the truth.  I don't remember it."  The trial court then allowed defense counsel to question Spencer, and the following conversation ensued:

[DEFENSE COUNSEL]:  Do you remember if you had some reason why you would have lied to the police back in 2006?

THE WITNESS:  No, sir, I don't remember.

THE COURT:  You need to answer his questions, sir.  I'm getting a little sick of this.  He asked you can you think of any reason why you would have lied to the police.

[DEFENSE COUNSEL]:  Back in 2006.

20

THE COURT: That doesn't require[] an "I don't remember." He's asking you for your present-day memory, sir. Now, he's going to ask you that question again, and I expect you to give him an answer based on your memory today.

[DEFENSE COUNSEL]: Is there any reason why you would have lied to the police back in 2006?

THE WITNESS: No, sir.

[DEFENSE COUNSEL]: Is there any reason why you would be lying today about your memory?

THE WITNESS: No, sir.

The trial court then called a short recess and directed Spencer to read his written statement and a transcript of his prior testimony.

After the recess, the trial court resumed questioning Spencer, and Spencer affirmed that he had signed and initialed his written statement and that it was his handwriting on the photographic arrays that he viewed. Spencer also stated that he had read a portion of his preliminary hearing testimony. The following colloquy ensued:

THE COURT: Well, after you read this much that you read, does any of this refresh your memory in any way?

THE WITNESS: No, sir.

THE COURT: You're saying you don't remember the preliminary hearing testimony and don't remember making this statement to the police?

THE WITNESS: No, sir, I don't remember.

THE COURT: Was there some reason you would go into the prosecutor's office earlier in the week and tell them you remembered and now change your mind?

THE WITNESS: No, sir.

THE COURT: Is somebody threatening you, sir?

21

THE WITNESS:  No, sir.

THE COURT:  Do you feel threatened in any way?

THE WITNESS:  No, sir.

THE COURT:  And you're saying you don't remember anything?

THE WITNESS:  No, sir.

Later, the trial court excused Spencer from the courtroom and addressed the lawyers:

> All right, lawyers, what do y'all want to do?  He seems reluctant to me.  I don't really think I have contempt power over the mom.  I'm not sure whether–I don't think I have contempt power over him, either.  I do think he's reluctant.  He–I'm sure he remembers more than what he's saying, but–

After discussion between the court and the attorneys, the trial court ruled as set forth above.

Our review of the record convinces us that, to the extent the trial court failed to technically instruct Spencer to testify, any such attempt by the trial court to order Spencer to testify would have been fruitless.[7]  Accordingly, we hold that the trial court committed no reversible error in determining Spencer to be unavailable for the purposes of Rule 804(a)(3). The Defendant is not entitled to relief on this basis.

### Admission of Written Statement and Prior Testimony
### as Violative of Right of Confrontation

The Defendant argues that, by admitting Spencer's written statement and prior testimony as substantive evidence, the trial court violated his constitutional rights of confrontation.  See U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  The State disagrees.[8]

---

[7] There is very little jurisprudence dealing with the contempt authority of a court of general jurisdiction over a juvenile.  See V. Woerner, Annotation, Court's Power to Punish for Contempt a Child within the Age Group Subject to Jurisdiction of Juvenile Court, 77 A.L.R.2d 1004 (1961) (referring to cases from one federal and eight state jurisdictions).  We have found no decisions by Tennessee's appellate courts dealing with this issue.  We deem it unnecessary to address this issue in this case.

[8] The Defendant did not include this issue in his motion for new trial.  Issues not included in the motion for new trial may be considered waived.  See Tenn. R. App. P. 3(e).  The State has not asserted waiver, however, and we have chosen to briefly address this issue on the merits.

Whether the admission of hearsay statements violated a defendant's confrontation rights is a question of law subject to de novo review. State v. Lewis, 235 S.W.3d 136, 141-42 (Tenn. 2007) (citing Lilly v. Virginia, 527 U.S. 116, 125 (1999); State v. Maclin, 183 S.W.3d 335, 342 (Tenn. 2006)). The proper application of that law to the trial court's factual findings is likewise a question of law, subject to de novo review. Id. at 142 (citing Maclin, 183 S.W.3d at 343; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997); Beare Co. v. Tenn. Dep't of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993)).

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI. Similarly, article I, section 9 of the Tennessee Constitution provides that, "in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. These provisions embrace "the right to physically face the witnesses who testify against the defendant[] and the right to cross-examine witnesses." State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996). "[W]hen deciding claims based on the right of confrontation provided in article I, section 9, we have expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." State v. Dotson, 450 S.W.3d 1, 62 (Tenn. 2014) (citing State v. Parker, 350 S.W.3d 883, 898 (Tenn. 2011); State v. Franklin, 308 S.W.3d 799, 809-10 (Tenn. 2010); State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); Lewis, 235 S.W.3d at 144-45).

The United States Supreme Court has spoken directly upon the issue of a defendant's right to confront a forgetful witness. See United States v. Owens, 484 U.S. 554 (1988). In Owens, the victim was severely beaten and suffered memory impairment. A few weeks after the attack, the victim identified the defendant as his assailant to an FBI investigator. At trial, the victim testified that he remembered identifying the defendant during his interview with the FBI agent but "admitted that he could not remember seeing his assailant." Id. at 556. Recognizing that "the testimony here involved an out-of-court identification that would traditionally be categorized as hearsay," id. at 560, the Court nevertheless rejected the defendant's Confrontation Clause challenge:

[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . It is sufficient that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination) the very fact that he has a bad memory. . . . The weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success, but successful cross-

23

examination is not the constitutional guarantee. They are, however, realistic weapons . . . .

Id. at 559-60 (quotation marks and citations omitted).

Thus, even when a trial court admits a witness' hearsay statements as substantive evidence, and the witness claims at trial not to remember the information contained within the hearsay statements, the Confrontation Clause is not violated when a defendant has an opportunity to cross-examine the witness at trial. See Bugh v. Mitchell, 329 F.3d 496, 508-11 (6th Cir. 2003) (holding that the defendant's right of confrontation was not violated by adult witnesses testifying about child victim's out-of-court statements implicating defendant because child, although exhibiting some lack of memory, testified at trial and was available for cross-examination); Diggs v. United States, 28 A.3d 585, 594 (D.C. 2011) (stating that "memory loss, whether genuine or feigned, does not deprive the defendant of the meaningful opportunity to cross-examine that the Confrontation Clause requires"); State v. Ackerman, 397 S.W.3d 617, 641 (Tenn. Crim. App. 2012) (holding that admission of victim's out-of-court statement did not violate the defendant's federal or state confrontation rights because victim testified at trial, notwithstanding victim's "nearly complete lack of memory"), overruled on other grounds by State v. Sanders, 452 S.W.3d 300, 315 n.11 (Tenn. 2014).[9] The Defendant is not entitled to relief on this basis. We also conclude that no basis exists for any different result under the Tennessee Constitution. See Tenn. Const. art. I, § 9; Dotson, 450 S.W.3d at 73-74 (holding that neither the federal or state constitutional rights to confrontation are violated by the use of prior testimonial statements when the declarant appears at trial and is subject to cross-examination).

*Sufficiency of the Evidence*

As set forth above, the jury convicted the Defendant of second degree murder as a lesser-included offense of first degree felony murder on the first count of the indictment and of reckless homicide as a lesser-included offense of first degree premeditated murder on the second count of the indictment. Second degree murder is defined as "[a] knowing killing of another," Tenn. Code Ann. § 39-13-210(a)(1) (2006), and is a "result of conduct" offense.

---

[9] We recognize that the Supreme Court has held that, if a witness is unavailable *at trial*, his or her prior statement may not be used against a defendant unless the defendant had a prior opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 54 (2004). As set forth above, the trial court deemed Spencer to be "unavailable" for purposes of Tennessee Rule of Evidence 804. The Owens Court made clear, however, that a witness' unavailability for purposes of determining the admissibility of hearsay evidence is not the same as a witness' unavailability for purposes of the Confrontation Clause. See Owens, 484 U.S. at 559-63; see also Ackerman, 397 S.W.3d at 641 & 641 n.7.

See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2006). Whether a defendant acted knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432. The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000); see also Brown, 311 S.W.3d at 432.

Reckless homicide is statutorily defined as "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a) (2006). "Like second degree murder, reckless homicide is a result-of-conduct offense." State v. Parker, 350 S.W.3d 883, 910 n.16 (Tenn. 2011). Our criminal code provides that

> "'Reckless'" refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c) (2006). "When recklessness suffices to establish an element, that element is also established if a person acts . . . knowingly." Id. § 39-11-301(a)(2) (2006). Thus, proof that a person acted knowingly simultaneously establishes, as a matter of law, that the person acted recklessly. As a result, when the evidence is sufficient to support a second degree murder conviction, it is also sufficient to support a conviction for reckless homicide.

The Defendant contends that the evidence was not sufficient to support either of his convictions. He argues in his brief to this Court that Spencer's out-of-court statements, "the testimony of convicted murdere[r] Mr. Bailey," and "the reluctant, inconsistent and untimely revelation of witness Mr. Holloway" were so "overwhelmingly unreliable" as to require this Court to reverse the jury's verdicts.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption

of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, this Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

In essence, the Defendant is asking this Court to reweigh the State's proof and to make credibility determinations about the State's witnesses. This Court does not perform those functions. Applying the appropriate standard of review, we hold that the proof at trial was sufficient for the jury to determine that the Defendant accosted the victim in the victim's back yard and pulled a handgun out of his pocket. When the victim did not accede to the Defendant's demand that the victim give him something, the Defendant pointed his gun at the victim and shot him once from a short distance, striking the victim in his torso. This proof was sufficient to support a conviction for second degree murder. See State v. Loverson, No. W2011-02055-CCA-R3-CD, 2012 WL 5509776, at *8-9 (Tenn. Crim. App. Nov. 14, 2012) (evidence sufficient to support second degree murder when defendant raised handgun and fired a shot at victim from four feet away, striking the victim in the chest and killing him), perm. app. denied (Tenn. Mar. 5, 2013); State v. Looper, No. M2011-01642-CCA-R3-CD, 2012 WL 3358155, at *8-9 (Tenn. Crim. App. Aug. 15, 2012) (evidence sufficient to support second degree murder where defendant aimed shotgun at unarmed victim and fired one shot from close range, striking the victim in the chest), perm. app. denied (Tenn. Dec. 12, 2012); State v. Raines, No. E2007-00840-CCA-R3-CD, 2008 WL 2152495, at *5 (Tenn. Crim. App. May 21, 2008) (evidence sufficient to support second degree murder where defendant pulled pistol and fired single shot at unarmed victim from less than six feet away), perm. app. denied (Tenn. Aug. 25, 2010). The Defendant is not entitled to relief on this basis. For the purposes of any further litigation in this case, we hold that the proof also was sufficient to support the Defendant's conviction of reckless homicide.

The jury convicted the Defendant of second degree murder as a lesser-included offense of first degree felony murder on the first count and convicted the Defendant of reckless homicide as a lesser-included offense of first degree premeditated murder on the second count. The jury's verdict of second degree murder on the first count of the indictment established that the Defendant acted knowingly when he shot and killed the victim. However, the jury's verdict of reckless homicide on the second count of the indictment established that the Defendant acted only recklessly when he shot and killed the victim. Although considering a single act of homicide, the jury determined through its verdicts that the Defendant acted with both a knowing state of mind and with only a reckless state of mind.[10] The Defendant contended in his application for permission to appeal that the jury's verdicts are therefore "mutually exclusive" and that, accordingly, this Court must merge the second degree murder conviction into the reckless homicide conviction and remand this matter for resentencing.[11] We disagree that the Defendant is entitled to relief on this basis.

Inconsistent verdicts may occur in trials of multiple defendants[12] or in trials of multiple charges against a single defendant. Because the instant case involves an inconsistency in verdicts on multiple charges against a single defendant, we will limit our discussion to inconsistent verdicts returned in such cases.[13]

---

[10] The jury's inconsistent verdicts in this case highlight the confusing nature of the current litany of lesser-included offenses that are instructed to the jury when first degree premeditated murder and first degree felony murder are charged in the alternative. The Defendant has raised no issue involving the appropriate lesser-included offenses to be charged under either theory.

[11] In his supplemental brief, the Defendant contends that the "mutually exclusive" verdicts should be set aside and that he should be granted a new trial for reckless homicide "since pursuant to the sequential jury instructions by the court, the jury has 'acquitted' him of all greater offenses." The Defendant cites us to no authority for the proposition that the jury's inconsistent verdicts entitle him, in and of themselves, to a new trial. Principles of double jeopardy do not entitle him to such relief, nor does any other precept of Tennessee law. For the reasons set forth in the remainder of our analysis of this issue, we hold that the Defendant is not entitled to a new trial on the basis of the jury's inconsistent verdicts.

[12] For instance, three defendants may be tried together on identical charges of conspiracy. If the jury acquits two of the defendants but convicts the third, the verdicts are inconsistent because the offense of conspiracy requires an agreement between two or more persons. See Eric L. Muller, The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts, 111 Harv. L. Rev. 771, 779-80 (Jan. 1998). Under Tennessee law, the conviction would be reversed. See State v. Copeland, 983 S.W.2d 703, 707 (Tenn. Crim. App. 1998).

[13] We note again that the Defendant was tried with Sawyer and that Sawyer was acquitted on all charges. However, the Defendant has raised no issue concerning any purported inconsistencies between the

Inconsistent verdicts on multiple charges against a single defendant may take the form of an inconsistency between a conviction and an acquittal. For instance, a defendant may be charged with committing both a felony murder and the predicate felony.[14] The jury then may convict the defendant of the felony murder but acquit the defendant of the predicate felony.[15] It is well-settled under Tennessee law that the defendant is not entitled to relief from the felony murder conviction in this situation as long as the evidence was sufficient to support his murder conviction. See, e.g., State v. Grogger, No. M2008-02015-CCA-R3-CD, 2009 WL 3832921, at *14, *17 (Tenn. Crim. App. Nov. 17, 2009), perm. app. denied (Tenn. Apr. 14, 2010); State v. Walker, No. 02C01-9704-CC-00147, 1997 WL 746433, at *3-5 (Tenn. Crim. App. Dec. 3, 1997), perm. app. denied (Tenn. Sept. 21, 1998). Accord Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973) ("This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.").

In United States v. Powell, 469 U.S. 57 (1984), in which the United States Supreme Court considered a defendant acquitted of the predicate offense but convicted of the compound offense, our nation's high court thoroughly explained the reasons for leaving undisturbed such inconsistent verdicts:

> [W]here truly inconsistent verdicts have been reached, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." Dunn [v. United States], 284 U.S. [390], 393 [(1932)]. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, as the above quote suggests, inconsistent verdicts–even verdicts that acquit on a predicate offense while convicting on the compound offense–should not

verdicts of the two defendants.

[14] Courts sometimes refer to the charge that includes the predicate felony–in this example, the felony murder charge–as the "compound" charge. See, e.g., United States v. Powell, 469 U.S. 57, 65 (1984); State v. Halstead, 791 N.W.2d 805, 806 (Iowa 2010).

[15] Inconsistent verdicts of conviction and acquittal may also occur when the jury considers two charges arising out of the same conduct and resulting in two victims. For instance, in DeSacia v. State, 469 P.2d 369 (Alaska 1970), the defendant was charged with two counts of manslaughter arising out of a traffic accident in which the driver and a passenger in a single car were killed. The jury returned a guilty verdict on one count and acquitted the defendant on the other count. The Alaska Supreme Court described the jury's verdicts as "irrational," id. at 378, and reversed the conviction and remanded for a new trial. Id. at 381. The court did not disturb the acquittal. Id. at 378.

necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.

Inconsistent verdicts therefore present a situation where "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored. Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course. . . . [N]othing in the Constitution would require such a protection, and we therefore address the problem only under our supervisory powers over the federal criminal process. For us, the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest. This possibility is a premise of <u>Dunn</u>'s alternative rationale–that such inconsistencies often are a product of jury lenity. Thus, <u>Dunn</u> has been explained by both courts and commentators as a recognition of the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch.

The burden of the exercise of lenity falls only on the Government, and it has been suggested that such an alternative should be available for the difficult cases where the jury wishes to avoid an all-or-nothing verdict. Such an act is, as the <u>Dunn</u> Court recognized, an "assumption of a power which [the jury has] no right to exercise," but the illegality alone does not mean that such a collective judgment should be subject to review. The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.

<u>Id.</u> at 64-66 (citations omitted).

Although the <u>Powell</u> Court refused to disturb the inconsistent verdicts before it, the Court specifically excluded from the scope of its decision the type of inconsistent verdicts that occur "where a guilty verdict on one count logically excludes a finding of guilt on the

other." Id. at 69 n.8. The United States Supreme Court since has not issued an opinion addressing specifically the fate of these so-called mutually exclusive verdicts.

State court decisions demonstrate that the determination of whether inconsistent verdicts are "mutually exclusive" is a vexatious one. For instance, the Alabama Supreme Court has recognized that "[c]onfusion exists throughout Alabama courts over the difference between inconsistent verdicts and mutually exclusive verdicts." Heard v. State, 999 So. 2d 992, 1000 (Ala. 2007); see also State v. Halstead, 791 N.W.2d 805, 807 (Iowa 2010) (noting that "the term 'inconsistent verdicts' is often used in an imprecise manner and may include a wide variety of related, but nonetheless distinct, problems"). After reviewing several decisions from the Georgia appellate courts, the Alabama Supreme Court adopted the following definition of mutually exclusive verdicts:

> [M]utually exclusive verdicts are the result of two positive findings of fact that cannot logically coexist. In other words, it is legally impossible for the State to prove the elements of both crimes. In order to determine whether the guilty verdicts are mutually exclusive as a matter of law, the alleged underlying offenses or acts must be carefully scrutinized. The two guilty verdicts are not mutually exclusive if no element of one crime necessarily negates an element of the other.

Heard, 999 So. 2d at 1004-05; see also Jackson v. State, 577 S.E.2d 570, 573 n.3 (Ga. 2003) ("Mutually exclusive verdicts, which cannot both stand, result in two positive findings of fact which cannot logically mutually exist. Inconsistent verdicts, which do not introduce invalidity, bespeak a positive finding of fact as to one charge and the failure to make a positive finding of fact as to the other. The latter, which results in an acquittal, does not constitute a negative finding of fact but may be explained as compromise, mistake, or lenity.").

The Iowa Supreme Court has attempted to parse inconsistent verdicts into at least four categories: "factually inconsistent" verdicts, "legally inconsistent" verdicts, verdicts that create a "compound inconsistency," and "mutually exclusive" verdicts. Halstead, 791 N.W.2d at 807-08, 807 n.2. The court described the latter category as occurring "when a jury makes positive findings of fact that are mutually inconsistent." Id. at 807 n.2. The Iowa Supreme Court also cautioned that "any potential remedy should be available only when the jury verdicts are truly inconsistent or irreconcilable. A reviewing court must carefully examine the pleadings and the instructions to ensure that the jury verdicts are so inconsistent that they must be set aside." Id. at 815.

Maryland's high court also has struggled with the issue of inconsistent verdicts. In Price v. State, the Maryland Court of Appeals granted relief to a defendant convicted by a jury of possessing a firearm during and in relation to a drug trafficking crime but acquitted of the underlying drug trafficking offenses. 949 A.2d 619, 630 (Md. 2008). The court asserted that, henceforward, "inconsistent verdicts [in criminal jury trials] shall no longer be allowed." Id.

Just a few years later, the Maryland high court reconsidered the breadth of its decision in Price and concluded that "jury verdicts which are illogical or factually inconsistent are permitted in criminal trials." McNeal v. State, 44 A.3d 982, 984 (Md. 2012). The court elucidated:

A legally inconsistent verdict is one where the jury acts contrary to the instructions of the trial judge with regard to the proper application of the law. Verdicts where a defendant is convicted of one charge, but acquitted of another charge that is an essential element of the first charge, are inconsistent as a matter of law. Factually inconsistent verdicts are those where the charges have common facts but distinct legal elements and a jury acquits a defendant of one charge, but convicts him or her on another charge. The latter verdicts are illogical, but not illegal.

Id. (citations and footnotes omitted). The court added, "legally inconsistent verdicts are those where a defendant is acquitted of a 'lesser included' crime embraced within a conviction for a greater offense." Id. at 984 n.1. Maryland's Court of Special Appeals has continued to explore the issue of inconsistent verdicts in criminal cases, see Travis v. State, 98 A.3d 281, 295-312 (Md. Ct. Spec. App. 2014), and has recognized that "inconsistency between verdicts is by no means a simple or one-dimensional problem," id. at 296.

Regardless of how courts label inconsistent verdicts, only a few state courts will grant relief to criminal defendants on that basis. See Eric L. Muller, The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts, 111 Harv. L. Rev. 771, 787-89 (Jan. 1998). In addition to those states referred to above, Connecticut, Florida, Indiana, Massachusetts, Missouri, New York, North Carolina, and Rhode Island have referred to granting relief on the basis of inconsistent verdicts, at least under some circumstances. See State v. Hinton, 630 A.2d 593, 600 (Conn. 1993) (on claim that verdicts are inconsistent as a matter of law or based on a legal impossibility, appellate court "look[s] carefully to determine whether the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted. If that is the case, the verdicts are legally inconsistent and cannot withstand challenge"); Brown v. State, 959 So. 2d 218, 220 (Fla. 2007) (recognizing that relief may be

granted on "truly inconsistent" verdicts in a criminal trial, "those in which an acquittal on one count negates a necessary element for conviction on another count"); Hoskins v. State, 563 N.E.2d 571, 577 (Ind. 1990) (stating that "extremely contradictory and irreconcilable verdicts warrant corrective action"); Commonwealth v. Gonzalez, 892 N.E.2d 255, 262 n.8 (Mass. 2008) (explaining that a "legally inconsistent verdict . . . arises when there exists no set of facts that the government could have proved in the particular case that would have resulted in the verdict at issue" and stating that legally inconsistent jury verdicts "cannot be sustained"); State v. Flemons, 144 S.W.3d 877, 883 (Mo. Ct. App. 2004) (when jury acquitted defendant of marijuana offense, defendant was entitled to relief from conviction of unlawful use of a weapon when the jury was instructed that the weapon charge "was dependent on a guilty finding" on the marijuana charge); People v. Delee, 969 N.Y.S.2d 350, 354 (N.Y. App. Div. 2013) (modifying judgment because, "based on our review of the elements of the offenses as charged to the jury, we conclude that the verdict is inconsistent, i.e., 'legally impossible,' insofar as it finds defendant guilty of manslaughter in the first degree as a hate crime but not guilty of manslaughter in the first degree") (citation omitted); State v. Speckman, 391 S.E.2d 165, 167-68 (N.C. 1990) (granting new trial to defendant on charges of embezzlement and false pretenses after jury convicted defendant of both because "a defendant may not be convicted of both embezzlement and false pretenses arising from the same act or transaction, due to the mutually exclusive nature of those offenses"); State v. Arroyo, 844 A.2d 163, 171 (R.I. 2004) (stating that "this Court will uphold logically inconsistent verdicts provided that the verdicts are legally consistent"). The Defendant asks that we join this small minority of states.

Over forty years ago, this Court rejected the argument that reversible error occurred when a jury returned inconsistent convictions and acquittals on multiple counts against a single defendant. See Wiggins, 498 S.W.2d at 93-94. In Wiggins, the two defendants were each charged with one count of petit larceny and one count of stolen property. After a joint trial, the jury acquitted both defendants of the larceny offense but convicted both defendants of concealing stolen property. Id. at 92. The defendants argued that

> the only factual issue in the case was proof of the theft, and that the proof presented precluded the possibility of the property in question being stolen by any other person or persons other than the defendants. Therefore, the jury having expressly acquitted the defendants of petit larceny, an essential element of concealing stolen property was missing; namely, that the property in question was in fact stolen.

Id. In addressing this issue, the Wiggins Court first noted that "the overwhelming authority supports the rule that consistency between verdicts on separate counts of an indictment is not necessary." Id. at 93. The Wiggins Court then turned to the United States Supreme Court

32

case <u>Dunn v. United States</u>, 284 U.S. 390 (1932), and was persuaded by the following reasoning that inconsistent verdicts may be allowed to stand:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than an assumption of a power which they had no right to exercise, but to which they were disposed through lenity.
>
> . . . .
>
> That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.

<u>Id.</u> (quoting <u>Dunn</u>, 284 U.S. at 393, 394). Accordingly, the <u>Wiggins</u> Court held that "[c]onsistency in verdicts for multiple count indictments is unnecessary . . . . This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." <u>Id.</u> at 93-94[16]; <u>see also</u> <u>State v. Thompson</u>, 285 S.W.3d 840, 849 (Tenn. 2009) (recognizing that, "in general, an inconsistency in multiple count verdicts in a criminal prosecution is not a basis for relief").

The instant case involves a different form of inconsistent verdicts, that of an inconsistency between two convictions on alternative counts arising from a single criminal action. As observed by Maryland's Court of Special Appeals, inconsistency between guilty verdicts is "relatively rare." <u>Travis</u>, 98 A.3d at 296. Here, on count one, the jury convicted the Defendant of second degree murder, thereby establishing that he committed a knowing killing. On the second count of the indictment, the jury acquitted the Defendant of second degree murder, choosing instead to convict the Defendant of reckless homicide. Regardless of whether we term these verdicts "mutually exclusive," we agree that these guilty verdicts are inconsistent. We disagree that the Defendant is thereby entitled to relief. We continue to agree with the significant majority of jurisdictions that inconsistent jury verdicts are not a basis for relief.

---

[16] The <u>Wiggins</u> Court also adopted <u>Dunn's</u> reasoning that consistent verdicts on a multi-count indictment were not necessary because each count functioned as a separate indictment. Therefore, "had separate indictments been returned and the cases been separately tried, an acquittal on one could not be pleaded as res judicata of the other . . . ." <u>Wiggins</u>, 498 S.W.2d at 93. <u>Dunn</u> subsequently was overruled on this point. <u>See</u> <u>Powell</u>, 469 U.S. at 64. Accordingly, we disregard this aspect of the <u>Wiggins</u> decision.

33

We emphasize that "[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation." United States v. Zane, 495 F.2d 683, 690 (2nd Cir. 1974); see also Commonwealth v. Thomas, 65 A.3d 939, 944-45 (Pa. Super. Ct. 2013) (recognizing that "the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment") (quoting Commonwealth v. Stokes, 38 A.3d 846, 855 (Pa. Super. Ct. 2011)). Therefore, we reject the argument that we should alter our long-standing position of honoring and respecting a jury's verdicts, even when they are inconsistent.

Moreover, as set forth above, the few jurisdictions that grant relief on the basis of "mutually exclusive" verdicts appear to struggle with both defining and applying the concept. We are disinclined to open the door to the increased confusion and increased litigation that arises from trying to parse a jury's inconsistent verdicts. Therefore, we hold that the Defendant is not entitled to any relief based on this argument.

We also reject the Defendant's contention that principles of double jeopardy require that his second degree murder conviction be merged into his reckless homicide conviction. The Defendant has cited us to no authority for this proposition, and we are aware of none. The jury's determination that the Defendant killed the victim knowingly necessarily proved that the Defendant also acted recklessly. See Tenn. Code Ann. § 39-11-301(a)(2); State v. Hyde, No. E2001-02708-CCA-RMCD, 2002 WL 88876, at *3 n.3 (Tenn. Crim. App. Jan. 15, 2002). That is, reckless homicide is a lesser-included offense of second degree murder. See Parker, 350 S.W.3d at 910; State v. Page, 184 S.W.3d 223, 227 (Tenn. 2006). Therefore, no principles of double jeopardy were offended when the jury convicted the Defendant of reckless homicide on the second count of the indictment because the trial court properly merged the reckless homicide conviction into the second degree murder conviction. As our Court of Criminal Appeals recognized in State v. Addison,

> Although the jury returned guilty verdicts for both counts of first degree murder, the trial court entered only one judgment of conviction that imposed only one sentence . . . . Essentially, it is the judgment of conviction that provides the legal authority for the executive branch of government to incarcerate a person who is sentenced to confinement. In this sense, it includes the imposition of the sentence by which a defendant is punished. Therefore, the trial court's entry of only one judgment of conviction imposing only one sentence . . . protects the defendant from receiving multiple punishments for the same offense. No double jeopardy peril exists.

34

973 S.W.2d 260, 267 (Tenn. Crim. App. 1997) (citations omitted).  See also State v. Banes, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993) (indicating that, when a defendant is convicted under two alternative theories for the same offense, "the guilty verdict on the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge") (footnote omitted); Ruffin v. State, 725 N.E.2d 412, 415-16 (Ind. 2000) (when jury convicted defendant of both felony murder and reckless homicide for killing one victim, trial court did not err by entering judgment of conviction on felony murder verdict returned on count II and vacating reckless homicide verdict returned on count I).  The Defendant is entitled to no relief on this basis.

## Conclusion

For the reasons set forth above, we hold that the Defendant is not entitled to relief on the issues raised in this appeal.  Accordingly, we affirm the Defendant's judgment of conviction of second degree murder.  It appearing that the Defendant is indigent, the costs of this cause are taxed to the State of Tennessee.


_____
JEFFREY S. BIVINS, JUSTICE