IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

February 16, 2016 Session at Union University[1]


**STATE OF TENNESSEE v. DEMETRIUS J. PIRTLE and CORDARIUS R. MAXWELL**


**Appeal from the Circuit Court for Madison County**
**No. 14121     Donald H. Allen, Judge**

_____

**No. W2014-02222-CCA-R3-CD  -  Filed July 22, 2016**

_____


The defendants, Demetrius J. Pirtle and Cordarius R. Maxwell, were each convicted by a jury of one count of robbery, a Class C felony; one count of aggravated robbery, a Class B felony; six counts of attempted second degree murder, a Class B felony; six counts of aggravated assault, a Class C felony; one count of vandalism of property worth $1,000 or more, a Class D felony; and one count of employing a firearm during the commission of a dangerous felony, a Class C felony.  After merging the aggravated assault convictions into the attempted second degree murder convictions, the trial court sentenced both defendants to an effective thirty-year sentence.  On appeal, Mr. Pirtle challenges only the sufficiency of the evidence, asserting that his identity was insufficiently proven on all counts save the vandalism conviction and that the elements of robbery were not established.  Mr. Maxwell raises the same issues as Mr. Pirtle, and he also challenges the conviction on the weapons offense as inconsistent with the other parts of the jury's verdict and contests the imposition of consecutive sentences.  The appeals were consolidated.  Following our review, we affirm the defendants' sentences and convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

_____

[1] Oral argument was heard in this case before law students at the Union University.

George Morton Googe, District Public Defender, and Gregory Gookin, Assistant District Public Defender, for the Appellant, Demetrius J. Pirtle; and David Camp, Jackson, Tennessee, for the Appellant, Cordarius R. Maxwell.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jerry Woodall, District Attorney General; and Shaun Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The victims, six young adults, decided to take a detour in an area of Jackson that they believed was dangerous. They encountered two men who robbed them of money and of a firearm and who then shot numerous times into the victims' vehicle.

On July 18, 2013, Erin Dillard, who was eighteen years old at the time, invited some friends to her parents' home in Milan, Tennessee, while her parents were out of town. There was alcohol at the party, which Ms. Dillard testified Clint Sutton, twenty-four, had helped her procure. The guests included Hayden Green, Thomas Caldwell, Sara Reagan, Maegan Smith, and Mr. Sutton. None of these guests, with the exception of Mr. Sutton, was over twenty-one years of age. All of the victims in the case testified that they had consumed some alcohol. Mr. Sutton testified that he did not feel any effects from the alcohol he had consumed. Several of the victims, including Mr. Caldwell, testified that Mr. Caldwell was very intoxicated, and Mr. Caldwell's testimony was, accordingly, not very detailed. Mr. Green and Ms. Reagan testified that they were also somewhat intoxicated.

After spending some time at Ms. Dillard's house, the group decided to go "mudding" in Bemis, south of Jackson, Tennessee, in Mr. Sutton's pickup truck. They left Ms. Dillard's home sometime after midnight, stopping to allow Mr. Green to drop his vehicle at his home. Mr. Sutton drove his truck, Ms. Smith sat in the middle seat in the front, and Mr. Green sat in the passenger's seat. Ms. Reagan sat behind the driver, Ms. Dillard was in the middle of the back row, and Mr. Caldwell was behind Mr. Green. Mr. Sutton drove on the back roads to get to Jackson. He testified he did not choose the back roads because he was intoxicated.

2

Mr. Sutton testified that he always carried a gun in his vehicle but that the other occupants did not know he had a gun. His gun was a .45-caliber handgun, loaded with eleven rounds. Mr. Green, Ms. Reagan, and Ms. Smith testified that, as they arrived in Jackson, Mr. Sutton said something about Lincoln Courts being the most dangerous place in Jackson, simultaneously turning into the Lincoln Courts area. Mr. Sutton testified that his reason for turning was that he had "wanted to do something interesting." Mr. Sutton testified that he had his gun in his lap, under his legs. After they pulled into Lincoln Courts, Ms. Smith was afraid and asked Mr. Sutton to turn around, and he turned into a driveway to turn around, then drove the opposite direction down the same street in an attempt to exit the area.

Mr. Sutton, Mr. Green, Ms. Dillard, and Ms. Reagan testified that they saw two young men walking in the road and that one of the men walked into the pathway of the truck, forcing Mr. Sutton to stop the vehicle. The victims were able to make various identifications of the defendants, both in photographic lineups and at trial. Mr. Sutton was able to identify Mr. Pirtle as the taller of the two young men. Mr. Sutton also described Mr. Pirtle's clothing and was able to identify a picture taken from Mr. Pirtle's Facebook page which showed him wearing a shirt and baseball cap which Mr. Sutton recognized from the night of the crime. Mr. Sutton identified Mr. Pirtle in court. Mr. Sutton also identified an individual from a photographic lineup as being the shorter of the two assailants. Mr. Sutton told police he was "confident" regarding both identifications; however, the person Mr. Sutton chose for the shorter assailant was not Mr. Maxwell. Mr. Sutton was not able to identify Mr. Maxwell in court. Ms. Dillard identified both defendants from a photographic lineup; however, in identifying Mr. Pirtle, she commented, "This guy only seems to be 10 to 20% right because of his eyes." Ms. Dillard identified both defendants in court. Ms. Reagan was able to identify Mr. Maxwell but could not identify Mr. Pirtle from a photographic lineup. She identified both defendants in court. She acknowledged having told an investigator that she could not identify Mr. Pirtle because she could not see him well from the back seat. Ms. Reagan testified that she spoke with Mr. Maxwell during the encounter and remembered him well. She acknowledged that she was a friend of Ms. Dillard's and might have had an opportunity to talk with her about the photographic array containing Mr. Maxwell, but she testified she did not recall doing so. Mr. Caldwell and Ms. Smith could not identify either defendant, Mr. Caldwell because he was intoxicated and Ms. Smith because she was so frightened that she never looked at the men. Mr. Green also could not make any identifications.

After the vehicle stopped, the two young men approached the driver's window, and Mr. Pirtle spoke with Mr. Sutton while Mr. Maxwell asked Ms. Reagan her name. All of the victims denied that they were in the area to purchase drugs. Ms. Reagan testified that she saw Mr. Maxwell pull marijuana out of his pants and offer it for sale but

3

that no one bought the drugs. Ms. Dillard and Ms. Smith also testified that the defendants asked the victims if they wanted to buy drugs but that the victims said they did not.

Mr. Sutton testified that, as they were talking to the men through the window, he momentarily turned to Mr. Green. Mr. Sutton stated, "At that time, I felt something brush my arm, my leg, and as I looked back over, I noticed that the taller guy had reached into my truck. He had seen the gun that I had had, and he just grabbed it out, took it." Mr. Green, Ms. Dillard, Ms. Reagan, and Ms. Smith also saw one of the men lean in to take a firearm from Mr. Sutton. Mr. Sutton stated that after he felt something brush his arm, he looked and saw Mr. Pirtle "pulling [the gun] out of the window." Ms. Reagan and Mr. Sutton saw Mr. Maxwell reach into his shorts to pull out a gun. Mr. Green and Ms. Dillard also testified that the assailants had a second gun. All of the victims except Mr. Caldwell testified that the men were pointing the guns at Mr. Sutton. Mr. Green testified that Mr. Sutton's gun was pointed "in our faces."

At this point, the victims apparently entered into some negotiations to attempt to regain Mr. Sutton's gun. Mr. Sutton stated that he asked how he could get his gun back, and Mr. Pirtle told him he could get it for $400. Mr. Green said that the men wanted $375, and Ms. Dillard testified that they wanted $400 but Mr. Green had $375 in cash with him. Ms. Smith testified that Mr. Sutton "kept asking for his gun back." Ms. Reagan testified that the men were telling Mr. Sutton to buy back his gun but that Mr. Sutton hesitated because he did not feel he should have to pay for his own gun.

Mr. Green testified that he had $500 in his wallet and offered to buy the gun back for Mr. Sutton. Mr. Green testified that he frequently carried a lot of cash to emulate some older men he knew. Mr. Green was counting the money out and handing it to Mr. Sutton when one of the men, whom Mr. Sutton identified as Mr. Pirtle, grabbed all of the money from his hand. Ms. Dillard, Ms. Reagan, and Ms. Smith also testified that one of the men took the money from Mr. Green. Ms. Smith testified that Mr. Green was asking for his money back and Mr. Sutton was asking for his gun. Mr. Sutton, Ms. Smith, Ms. Dillard, and Ms. Reagan testified that after taking the money, the men told them to leave.

At the urging of his companions, Mr. Sutton drove off. After the car was in motion, the victims became aware that their assailants were shooting at them. Ms. Smith testified that the shots started a few seconds after the car began to move. Mr. Sutton testified they had driven about thirty to fifty feet. Mr. Caldwell testified it was approximately ten yards. When he became aware of the gunfire, Mr. Sutton looked in the side mirror and could see two muzzles flashing. Ms. Dillard also testified that she saw both men shooting. All the victims testified that they ducked down and were afraid. The

4

glass in the back window of the truck was struck by a bullet near where Mr. Caldwell was seated, and the broken glass cut the back of his neck.

The victims left Lincoln Courts and stopped at a closed gas station. They determined that the only injury was a minor cut on Mr. Caldwell's neck. Mr. Sutton observed numerous bullet holes in his truck. Mr. Sutton stated that the damage to his truck was in excess of $1,000. Mr. Sutton testified that he believed there was alcohol in the car, although he did not see it, and that he believed someone threw it away at the gas station. Ms. Dillard testified that there was whiskey in the back of the car but that they did not throw it out at the gas station. Mr. Green also testified that there was alcohol in the car. Ms. Reagan agreed that she had told Investigator Headen that there was alcohol in the car, but at the time of trial she did not recall alcohol being in the vehicle.

None of the victims called for emergency aid, although all had their cellular telephones. They also did not stop at a fire station located near the area of the crime. Instead, they decided to drive back to Milan. Mr. Sutton testified that he made the decision "based on how hysterical everybody was." When they got to Milan, Mr. Sutton called Brian Hutson, a Milan police officer whom they happened to pass on their way into town, using Mr. Hutson's personal telephone. Some of the victims got a ride with a friend to their homes. Mr. Hutson testified that Mr. Sutton told him he had made a wrong turn, ended up in Lincoln Courts, and that shots were fired at him. Mr. Hutson told Mr. Sutton to go to Jackson and file a report. Because Mr. Sutton's tire was flat, Mr. Hutson helped him put some air into it.

Mr. Sutton agreed that in the gas station parking lot, he told everyone a plan to "get out of being in trouble for being around that area." Mr. Sutton testified that the others were "worried" and "scared" and that he was trying to alleviate their fears. Mr. Green testified that Mr. Sutton called him after the victims had gone their separate ways and told him to "leave out the part about going to Lincoln Courts" because Mr. Sutton planned to tell police he was the only one who had gone there. Ms. Dillard agreed that Mr. Sutton "was going to say he was the only person in the truck."

At approximately 4:00 a.m., Mr. Sutton called the Jackson police department to report the crime. He told the dispatcher that he estimated the shooting had taken place at 3:00 a.m. Defense counsel questioned Mr. Sutton regarding the timing of events, given his testimony that they had left Ms. Dillard's house at a little after midnight. Mr. Sutton told the officer on the phone that he had a flat tire and could not drive to Jackson to file a report. He also told the officer that he had made a wrong turn, was shot at, and had his gun stolen. He made no mention of other people in the car and told the officer that his gun had been in the console when it was stolen. Mr. Sutton told the officer that the weapon used to shoot at him was a Glock.

5

Mr. Sutton gave a formal statement to police on the next day, July 19, 2013. Mr. Sutton acknowledged that he had recounted to Ms. Dillard what he said to police and that he asked her to say the same thing. All of the victims gave statements to police in which they left out the fact that they had been drinking alcohol. Mr. Sutton's statement contained other inaccurate information, including that he had gone to Lincoln Courts by mistake and that the assailants popped out of nowhere and immediately pulled guns on him.

Investigator Mark Headen took the statement from Mr. Sutton and obtained the contact information of the others in the vehicle. Law enforcement then photographed the damage to Mr. Sutton's car. Investigator Headen testified that there were twelve bullet holes in the vehicle, mainly in the tailgate and rear, and that Mr. Sutton stated that his tire had also been punctured by a bullet. Investigator Headen took Mr. Sutton to Lincoln Courts to try to locate the exact area of the shooting. Mr. Sutton did not know the street name, but he was able to recognize the area. Police found sixteen bullet casings in the street and on the grass. Eight were .45-caliber silver casings, and eight were .40-caliber casings of assorted manufacture.

Investigator Headen talked to the victims a second time, confronting them with the fact that they had not been entirely truthful. The victims gave statements consistent with their trial testimony. After some of the victims identified the two defendants in a photographic lineup, Investigator Headen took part in apprehending the defendants. On July 24, 2013, law enforcement went to an address where they believed the defendants might be found. The apartment was approximately three hundred yards from the location of the assaults. Mr. Maxwell was found outside the apartment, sitting on the steps. Mr. Pirtle was found inside the apartment. On top of the kitchen cabinets, police recovered a Glock handgun which had previously been reported stolen. The gun was loaded with sixteen .40-caliber bullets. Eric Warren, a firearms expert from the Tennessee Bureau of Investigation, testified that the eight .40-caliber casings recovered from the crime scene were fired by the Glock recovered from the top of the kitchen cabinets in the apartment where the defendants were located. Mr. Sutton's gun was never recovered, but Agent Warren testified that the eight .45-caliber casings at the crime scene were all fired from the same weapon.

Mr. Maxwell introduced the testimony of Samantha Spencer, a forensic scientist at the Tennessee Bureau of Investigation. Agent Spencer testified that she analyzed the Glock recovered from the refrigerator to see if she could recover a DNA profile that would reveal who had handled the gun. Agent Spencer was able to recover a mixture of genetic material from two individuals. Mr. Maxwell, however, was excluded as a

6

contributor to the DNA on the handle of the weapon. Agent Spencer testified that touch DNA is not always present and can be fragile.

The jury returned a verdict convicting each defendant of the lesser-included offense of attempted second degree murder in each count charging the defendants with attempted first degree murder. The jury found each defendant guilty of robbery, aggravated robbery, six counts of aggravated assault, vandalism, and the use of a firearm in a dangerous felony as charged. The jury also imposed approximately $230,000 in fines for each defendant.

The trial court held a sentencing hearing, during which Mr. Pirtle did not present proof. Several of Mr. Maxwell's family members, including his mother, great-uncle, grandmother, and the mother of his two children, testified that they relied on Mr. Maxwell, that he did not behave violently, and that they would assist him if he were not in prison.

The trial court merged the six aggravated assault convictions into the six attempted second degree murder convictions. In imposing a sentence, the trial court considered the evidence at trial, the evidence at sentencing, the presentence report, the arguments of counsel, and the principles of sentencing. The trial court, in considering the circumstances and nature of the crimes, noted that each defendant shot eight times at a vehicle that was attempting to leave after the robberies had already been completed. The court sentenced the defendants to serve six years for the robbery, twelve years for the aggravated robbery, twelve years for each attempted second degree murder, four years for the vandalism, and six years for the weapons offense. The trial court reduced the fines to $30,000 for each defendant. The trial court then chose to run some of the sentences consecutively. The trial court ordered the robbery, aggravated robbery, and vandalism convictions to all run concurrently with one another; it then order the attempted murder convictions to run concurrently with one another but consecutively to the aggravated robbery. The firearms conviction was to be consecutive to the robbery convictions and the attempted murder convictions for a total effective sentence of thirty years. In deciding to impose consecutive sentences, the trial court relied on its finding that each defendant was on probation at the time the crime was committed, that each defendant had an extensive record of criminal activity, and that each defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. The trial court found that the circumstances of the crime were aggravated in that the defendants each fired a number of shots at close range into a vehicle containing six people. The trial court also found that confinement was necessary to protect society from further criminal activity, noting that both defendants had prior weapons convictions, and it found the length of the sentences reasonably related to the severity of the offenses.

7

The defendants filed separate motions for a new trial, and the motions were denied. During Mr. Pirtle's motion for a new trial, the trial court found that the jury had been instructed only on attempted first degree murder as the predicate felony for the weapons offense, but it concluded that inconsistent verdicts were not contrary to Tennessee law. The trial court found that the evidence was sufficient to support the convictions of both defendants and that it had not erred in sentencing. The appeals were consolidated. On appeal, Mr. Pirtle challenges only the sufficiency of the evidence. Mr. Maxwell also asserts the verdicts were inconsistent, and he challenges the trial court's sentencing decisions.

## ANALYSIS

### I. Sufficiency of the Evidence

Both defendants challenge the sufficiency of the evidence. The defendants both argue that the State did not prove the elements of robbery and that the evidence related to that conviction at most showed that the defendants were guilty of the theft of Mr. Sutton's weapon. In addition, both challenge the proof regarding identity.

Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). When the defendant challenges the sufficiency of the evidence, the appellate court may not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). The same standard applies to verdicts based on direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

8

## A. Robbery

The defendants argue that there was no evidence that Mr. Sutton had been put in fear at the time his gun was removed from his lap or that the removal of the weapon was accomplished by violence.

Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, and theft is knowingly obtaining or exercising control over property without the owner's effective consent and with the intent to deprive the owner of property. T.C.A. § 39-13-401(a) (2010); T.C.A. § 39-14-103(a). The definition of "deprive" includes to "[w]ithhold property or cause it to be withheld for the purpose of restoring it only upon payment of a reward or other compensation." T.C.A. § 39-11-106(a)(8)(B). Theft is a lesser included offense of both robbery and aggravated robbery. *State v. Hayes*, 7 S.W.3d 52, 56 (Tenn. Crim. App. 1999). "The use of violence or fear elevates theft to robbery," and a taking becomes robbery rather than theft depending on whether and when fear or violence is introduced. *State v. Swift*, 308 S.W.3d 827, 830 (Tenn. 2010).

In *Swift*, the court noted that "[t]he temporal proximity between the taking of property and the use of violence or fear is the sole relevant factor." *Swift*, 308 S.W.3d at 831. The *Swift* court determined that the theft in that case was completed when the defendant removed merchandise from its packaging and concealed it in his pants. *Id.* Accordingly, his use of a knife to intimidate the loss-prevention personnel at the exit to the store several minutes after the taking was a separate aggravated assault but did not convert the theft into aggravated robbery. *Id.* The use of violence or fear must precede or occur concomitantly or contemporaneously with the taking. *State v. Owens*, 20 S.W.3d 634, 641 (Tenn. 2000). "Force used to retain property already unforcibly taken or force used to escape, however, is not the force essential to satisfy the element of force required for robbery." *Id.* at 638.

Violence, as required by the robbery statute, is "physical force unlawfully exercised so as to injure, damage or abuse." *State v. Bowles*, 52 S.W.3d 69, 80 (Tenn. 2001) (quoting *State v. Fitz*, 19 S.W.3d 213, 217 (Tenn. 2000)). This court has found that property was taken through violence when the perpetrator "jerked" the victim's purse and dragged her backwards as she held on. *State v. Lawrence Hailey*, No. W2009-00759-CCA-R3-CD, 2010 WL 2219574, at *7 (Tenn. Crim. App. May 24, 2010); *see also State v. Anthony Clinton*, No. W2010-02157-CCA-R3-CD, 2011 WL 4026863, at *4 (Tenn. Crim. App. Sept. 12, 2011) (struggle over cash register satisfied element of violence). Pointing a weapon satisfies the element of violence. *State v. Allen*, 69 S.W.3d 181, 186 (Tenn. 2002). "A theft of a wallet from the pocket or purse of an unknowing or unresisting victim," on the other hand, does not establish the element of violence. *Fitz*,

19 S.W.3d at 217. Fear is "fear of present personal peril from violence offered or impending." *Bowles*, 52 S.W.3d at 80 (quoting *Britt v. State,* 26 Tenn. (7 Hum.) 45 (1846)).

Several appellate cases have upheld robbery convictions where the taking was not yet complete at the time that the defendant employed fear or violence. *See*, *e.g.*, *State v. Antonio Crenshaw*, No. W2014-01367-CCA-R3-CD, 2015 WL 2447717, at \*5 (Tenn. Crim. App. May 22, 2015), *perm. app. denied* (Tenn. Sept. 18, 2015) (concluding that the elements of robbery were established when the defendant filled a trash can with clothing in a department store and then engaged in a struggle with an employee on his way out, because the taking was only completed when he snatched the trash can from the employee and exited the store); *State v. Tray Turner*, No. E2010-02540-CCA-R3CD, 2012 WL 1077153, at \*8 (Tenn. Crim. App. Mar. 30, 2012) (holding that a defendant who took unpaid-for merchandise to a K-Mart vestibule had not completed the taking because he had neither concealed nor removed the merchandise); *State v. Johnson*, 366 S.W.3d 150, 157 (Tenn. Crim. App. 2011) (concluding that the taking of nonconcealed, openly possessed merchandise was not completed at the time the defendant walked past the cash register and confronted an employee who had locked the doors to prevent him from leaving); *State v. Claude Phillips*, No. W2008-02810-CCA-R3-CD, 2010 WL 2695328, at \*3 (Tenn. Crim. App. July 7, 2010) (holding that offense of aggravated robbery was supported by sufficient evidence when the defendant successfully took an item from a store, returned to the store and tried to exchange the item for store credit, and brandishing a weapon, retrieved the item from behind a counter, concluding the retrieval of the item constituted a second taking); *State v. Chase Courtland Powell*, No. E2009-01301-CCA-R3-CD, 2010 WL 2219620, at \*5 (Tenn. Crim. App. June 2, 2010) (upholding robbery conviction where the defendant stuck his hand in a cash register drawer, the cashier tried to close the drawer on his hand, and he pushed her to get away, concluding that the "level of possession of the property" was less than that in *Swift* and that the force occurred in the "same short instance").

However, the Tennessee Supreme Court in *State v. Owens* specifically rejected the "continuous offense theory" of robbery. *Owens*, 20 S.W.3d at 641. Noting that "a majority of jurisdictions have defined robbery to extend to those situations in which a use of force occurs after a taking of the property," the Court nevertheless determined that the Tennessee Legislature had not intended to apply the robbery statute under those circumstances. *Id.* The *Owens* court noted that "'subsequent violence or putting in fear will not make a precedent taking, effected clandestinely, or without either violence or putting in fear, amount to robbery.'" *Id.* at 638 (quoting *Register v. State*, 97 So.2d 919, 922 (Miss. 1957)).

We conclude that the taking of the gun was simultaneous to the use of violence or fear, distinguishing this case from cases such as *Swift* and *Owens*. In both *Swift* and *Owens*, the use of fear or violence occurred well after the taking was complete; however, in this case, the fear or violence was contemporaneous with the taking. Mr. Pirtle reached into the truck, brushing Mr. Sutton's arm, and Mr. Sutton looked and saw Mr. Pirtle pulling the gun out of the window. Mr. Pirtle did not attempt to conceal the gun on his person but immediately pointed it at Mr. Sutton, who testified that he felt fear when the gun was pointed at him. By simultaneously taking the gun and pointing it at Mr. Sutton, Mr. Pirtle utilized fear or violence to complete the taking. We conclude that the evidence is sufficient to support the defendants' conviction for robbery.

### B. Identity

Both defendants also challenge all of their convictions save the vandalism conviction on the basis that the State did not sufficiently prove the identity of either defendant. The State points out the logical inconsistency of excepting the vandalism conviction from this challenge, as the vandalism occurred when the truck became the object of gunfire.

Identity is an essential element of every crime. *State v. Bell*, 480 S.W.3d 486, 517 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). In resolving questions of fact, such as the identity of the perpetrator, "the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby,* 858 S.W.2d 892, 897 (Tenn. 1993)). The jury may believe portions of a witness's testimony but disbelieve other portions. *Thomas*, 158 S.W.3d at 388. The fact that a witness changes identification does not require the appellate court to discredit the testimony because the jury as the trier of fact determines the credibility of witnesses. *Id.*

Here, Mr. Sutton, who spoke for a few minutes with the taller assailant, identified Mr. Pirtle as the taller man in a photographic lineup and in court. Ms. Dillard chose Mr. Pirtle from a photographic lineup, but she noted that she was only ten or twenty percent sure "because of his eyes." Ms. Dillard and Ms. Reagan, however, both identified Mr. Pirtle in court. Ms. Dillard and Ms. Reagan, who were in the backseat and had some interaction with the shorter assailant, both identified Mr. Maxwell from a photographic lineup and in court. Mr. Sutton, when presented with the photographic lineup containing Mr. Maxwell, chose another individual in lieu of Mr. Maxwell. On top of the kitchen cabinets of the apartment where the defendants were arrested, police found one of the guns which had fired eight bullets at the crime scene. The DNA profile recovered from the weapon excluded Mr. Maxwell as a contributor, but the defendant's expert testified

that touch DNA is fragile and cannot always be recovered. We conclude that a rational trier of fact could have found that the defendants were the perpetrators of the crimes charged.

The defendants do not allege that the State failed to prove the other elements of the crimes charged. The victims testified that two men stopped their vehicle and came to the driver's side window. While they were speaking, one of the men took Mr. Sutton's gun from his lap. The gun was pointed at the occupants of the vehicle, and a second gun was produced. When Mr. Green attempted to hand Mr. Sutton a portion of $500 to repurchase the weapon, the taller man grabbed the entire $500, and the victims were told to drive away. When the victims had begun to drive off, both assailants fired shots into the vehicle. The vehicle suffered numerous bullet holes, and investigators found sixteen bullet casings at the scene, eight from a gun consistent with one stolen from Mr. Sutton and eight from a gun recovered from the apartment where the defendants were arrested. We conclude that the evidence is sufficient to support the verdicts.

## II. Inconsistent Verdicts

Mr. Maxwell also challenges his conviction on the employment of a firearm in a dangerous felony conviction. Mr. Maxwell argues that, in convicting him of attempted second degree murder, the jury acquitted him of attempted first degree murder and that accordingly the conviction, which specified the underlying dangerous felony as attempted first degree murder, cannot stand. The State notes that the jury instructions were not included in the record but that the record contains a discussion of the jury instructions in which the trial court found that it instructed the jury that it must find the defendant guilty of the elements of attempted first degree murder as the predicate felony for the weapons offense.

Inconsistent verdicts may occur when multiple charges are brought against one defendant. *State v. Davis*, 466 S.W.3d 49, 72 (Tenn. 2015). Inconsistent verdicts are evidence that the jury departed from the trial court's instructions, but the verdict should not necessarily be viewed as a windfall to the government because the inconsistency does not reveal "whose ox has been gored." *Id.* at 73 (quoting *United States v. Powell*, 469 U.S. 57, 65 (1984)). Accordingly, "[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation." *Id.* at 77 (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)). So long as the appellate court determines that the evidence established guilt on the offense of which the accused is convicted, inconsistent verdicts may stand. *Id.* at 76. In short, "inconsistent jury verdicts are not a basis for relief." *Id.* at 77.

Here, the jury acquitted the defendants of attempted first degree murder and found them guilty instead of the lesser-included charge of attempted second degree murder. However, it found the defendants guilty of employing a firearm in the commission of attempted first degree murder. Tennessee Code Annotated section 39-17-1324(b)(1) makes it an offense to employ a firearm during the commission of a dangerous felony. Attempted first degree murder in violation of Tennessee Code Annotated section 39-13-202 is defined by statute as a dangerous felony. T.C.A. § 39-17-1324(i)(1)(A). The defendants were charged with an attempted premeditated and intentional killing under Tennessee Code Annotated section 39-13-202(a)(1). The State, accordingly, had to show that the attempted killing was done after the exercise of reflection and judgment and the intent to kill was formed prior to the act. T.C.A. § 39-13-202(d). In order to show attempted first degree premeditated murder, the State had to demonstrate that the defendants acted "with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3).

Mr. Maxwell argues that this case does not present inconsistent verdicts because the jury acquitted him on the attempted first degree murder charges. However, we note that "[i]nconsistent verdicts on multiple charges against a single defendant may take the form of an inconsistency between a conviction and an acquittal." *Davis*, 466 S.W.3d at 72. In fact, *Davis* cites to numerous cases where a defendant was convicted of felony murder but acquitted of the underlying felony. *Id.* We discern no logical distinction between those cases and the one at bar.

We are satisfied that the evidence established guilt of the offense upon which the conviction was returned. *See Davis*, 466 S.W.3d at 77. The evidence showed that, after taking the victims' gun and money, the defendants stepped back and told the victims to leave. The victims complied by driving off. After an interval described as a few seconds, when the car had driven approximately thirty to fifty feet, both defendants began to fire multiple shots into the car. Sixteen bullet casings, eight from each weapon, were collected. The rear tailgate of the car had close to a dozen bullet holes, and one bullet shattered the glass above Mr. Caldwell's head. Despite the acquittal on the attempted first degree murder charge, the State presented evidence from which a rational trier of fact could have found that the defendants, by shooting eight times each into a nearby vehicle containing six people, committed attempted first degree murder, and that they thereby employed a firearm during the commission of a dangerous felony.

For the first time on appeal, Mr. Maxwell also asserts that a conviction for both employment of a firearm during the commission of a dangerous felony and the predicate felony violates the principles of double jeopardy. Both the United States Constitution

and the Tennessee Constitution protect against double jeopardy. U.S. Const. amend. V; Tenn. Const. art. I, § 10. In order to ascertain if dual convictions violate double jeopardy, the appellate court must first look to the intent of the Legislature. *State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012). "If the General Assembly has expressed an intent to permit multiple punishment, no further analysis will be necessary, and multiple convictions should be upheld against a double jeopardy challenge." *Id.* Only when the legislative intent is unclear does the court analyze the offenses to determine if the offenses contain the same elements. *State v. Smith*, 436 S.W.3d 751, 767 (Tenn. 2014).

The statute at issue specifies that the crime of employing a firearm during the commission of a dangerous felony "is a specific and separate offense, which shall be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony," and it provides that the sentence should be consecutive to the sentence for the underlying felony. T.C.A. § 39-17-1324(d), (e). Accordingly, it is clear that the Legislature intended to permit multiple punishments. *See*, *e.g.*, *State v. Walter H. Webb*, No. M2014-01929-CCA-R3-CD, 2015 WL 8519525, at *8 (Tenn. Crim. App. Dec. 11, 2015) *perm. app. granted* (Tenn. Apr. 13, 2006) (concluding that convictions for aggravated burglary and employing a firearm during the commission of a dangerous felony did not violate principles of double jeopardy); *State v. Jeremiah Dawson*, No. W2010-02621-CCA-R3-CD, 2012 WL 1572214, at *5-7 (Tenn. Crim. App. May 2, 2012) ("The legislature specifically listed carjacking as a dangerous felony for which a defendant could be prosecuted for employing a firearm. Therefore, the legislature obviously intended for dual convictions and multiple punishment."). Accordingly, Mr. Maxwell is not entitled to relief on these grounds.

### III. Sentencing

Mr. Maxwell also challenges his sentences, arguing that the trial court erred in imposing consecutive sentences because the aggregate length of his sentence is not related to the seriousness of the offense and is greater than deserved for the offense. Mr. Maxwell challenges the imposition of partial consecutive sentencing rather than the length of the individual sentences.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Likewise, the "standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies only when the trial court has provided reasons on the record establishing at least one of the seven statutory bases for imposing consecutive sentences

delineated in Tennessee Code Annotated section 40-35-115(b). *Id.* at 861. Any one statutory ground is sufficient for the imposition of consecutive sentences. *Id.* at 862. Tennessee Code Annotated section 40-35-115(b) allows a court to impose consecutive sentences when "[t]he defendant is an offender whose record of criminal activity is extensive," when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high," or when "[t]he defendant is sentenced for an offense committed while on probation." T.C.A. § 40-35-115(b)(2), (4), (6). When the trial court bases its decision to run sentences consecutively on the dangerous offender category, it must make the additional findings set out in *State v. Wilkerson*: that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)).

Here, both defendants were on probation at the time of the shooting. The trial court relied on this ground, and thus the sentences are presumed reasonable. The trial court also found that the defendants fell into the dangerous offender category, and it made the findings required by *Wilkerson*. In imposing the aggregate sentence, the trial court noted that the defendants had already taken possession of the money and the gun and that the victims were in the process of fleeing when sixteen shots were fired into the vehicle of six people. The trial court correctly considered the purposes and principles of sentencing and found that the aggregate length of the sentences reasonably related to the offenses committed. We discern no abuse of discretion. Accordingly, Mr. Maxwell is not entitled to relief.

## CONCLUSION

Based upon the foregoing analysis, we affirm the judgments of the trial court. We note that the trial court did not enter separate judgments for the aggravated assault convictions in Counts 4, 6, 8, 10, 12, and 14. We remand for the entry of judgment forms for these convictions pursuant to the Tennessee Supreme Court's Order in *State v. Marquize Berry*, No. W2014-00785-SC-R11-CD, at *5 (Tenn. Nov. 16, 2015).

_____
JOHN EVERETT WILLIAMS, JUDGE

15