IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2024

**STATE OF TENNESSEE v. LOGAN DARBY HELTON**

**Appeal from the Criminal Court for Bradley County**
**No. 22-CR-461      Sandra N.C. Donaghy, Judge**

_____

**No. E2023-01132-CCA-R3-CD**

_____

Logan Darby Helton, Defendant, claims the trial court abused its discretion by denying his application for judicial diversion relative to his guilty-pleaded convictions for aggravated burglary, aggravated criminal trespass, and unlawful photographing in violation of privacy. Following a thorough review of the record and applicable law, we affirm the judgments of the trial court but remand the case for entry of a corrected judgment form in Count 2 reflecting a sentence of eleven months twenty-nine days.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed, Count 2 Remanded for Entry of Corrected Judgment**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Kenneth L. Miller, Cleveland, Tennessee, for the appellant, Logan Darby Helton.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Shari Tayloe, District Attorney General; and Aaron Chaplin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant pleaded guilty to aggravated burglary (Count 1), aggravated criminal trespass (Count 2), and unlawful photographing in violation of privacy (Count 3). Pursuant to the plea agreement, Count 2 would merge into Count 1; Defendant would not be placed on the sex offender registry related to Count 3; and the length of the sentence and manner

of service would be determined by the trial court following a sentencing hearing. At the plea submission hearing, the State presented the following factual basis for the plea:

> Your Honor, if this case had gone to trial, the proof would have been that on July 8th of 2022, [K.W.[1]] -- she was at home at [] Road here in Bradley County. This was about 10:30 that evening she had just taken a shower, and she notices sitting next to her vanity sink is a device that's plugged into an outlet there. And the device is facing her shower, and the device itself looks like a phone charger, and when she looks at it more closely, she notices it's a camera.
>
> At that time, she contacts her parents, she goes to their home and contacts law enforcement who then meets her at her parent's house. And then, they all go back to [] Road and -- to check the home itself. The device is then collected by Deputy Wallace, inside the home there's also actually muddy footprints that were seen at that time by [K.W.], and by Officers. The device is collected by Deputy Wallace, and is turned over into evidence. And Kathy Shoemaker looks at the device, it's actually a motion -- and Detective Edwards, he's the lead investigator in this case, is a motion-activated camera that has an SD card with . . . 32 gigabytes of memory, which would be approximately 8 hours of video -- which this device could hold.
>
> When they look at the device, they see there are multiple videos of [K.W.] on it, including videos where she is naked getting in and out of the shower. Also on that is the video of her finding the device, and then there's separate videos of the individual that would appear to be -- planted the device. Those videos include a video from another location, another house. You see the person, you don't see his face, but you see the person. You see his home -- inside the home. And then, you see that same individual wearing the same shirt inside [K.W.]'s home after the device is plugged in to that outlet.
>
> That is shared with [K.W.]. [K.W.] identifies that person as [D]efendant. And the home is also identified, and ends up -- Detective Edwards does a search warrant of the home, and finds the exact location of the outlet that -- when I said, "of the home," -- well [D]efendant's home, finds the exact location. And the outlet of where he plugged into presumably checked to see if it works, takes a picture of that -- and that same picture and the video are identical.

---

[1] It is the policy of this court to refer to victims of sexually-related offenses by their initials.

So, this is found in his home, there's also -- inside his home, there's packaging materials, and the manual for that device.

[K.W.] knows [Defendant] -- just his background, they grew up in the same church together. It would have been proof that he has had infatuation with her for years and that he has been told numerous times to kind of back off. And including, there were text messages between the parties all that day.

So, the proof would be that the [D]efendant went to her house, entered her home without permission, plugged the device in into her outlet, and stealing her electricity to activate that device; to take these photos of her [getting in and] out [of] the shower. And based on the -- and this -- I will note that this is a device that he did not actually ever obtain the videos. He would have had to come back at another time to collect it. It is not wi-fi capable, it is strictly a SD capable device.

He did not have permission to be in that home, he had never been in that home before, the proof would be. And, obviously, he did not have permission to take those photos or videos. All this occurred in Bradley County, Your Honor.

After assuring that Defendant agreed with the factual basis and that he was entering the plea knowingly and voluntarily, the trial court found Defendant guilty on all counts and set a date for the sentencing hearing.

Forty-eight letters from various individuals attesting to Defendant's good character were admitted as Collective Exhibit 1 at the sentencing hearing. The presentence report was entered as Exhibit 2, and the Victim Impact Statement was entered as Exhibit 3. The State presented no additional evidence.

Defendant testified that, at the time of the offenses, he was employed as a firefighter with the Cleveland Fire Department. He resigned from that position to avoid being terminated. At the time of the sentencing hearing, he was working in the concrete business. Defendant attended church with the victim and had known her for approximately twelve years. Defendant said that he used a key that he found on the ground to gain entrance into the victim's residence, where he installed a camera in the bathroom. He originally bought the camera to record possible thefts from a refrigerator at the firehall. The camera recorded but did not transmit information. The victim discovered the camera and contacted law enforcement. When contacted by law enforcement, Defendant initially denied knowledge of the camera. Police found a manual and other information concerning the camera in Defendant's home.

Defendant said that he made a "horrible" decision and that he was "ashamed" of his conduct and deeply sorry for the pain that he caused. Defendant stated that, at the time of the incident, he was drinking and "in a deeply depressed and dark state of mind." Defendant said that he was being treated for anxiety and depression at Journey Psychotherapy in Chattanooga; he noted that, before the incident, he had received mental health treatment at Journey Psychotherapy and another office. On cross-examination, Defendant admitted that he had been infatuated with the victim since they went on a date when he was fifteen and that the victim and other people had repeatedly told him to leave her alone.

Todd Helton, Defendant's father, testified that Defendant had been a good student and had never been in trouble. Mr. Helton said that he and his wife attended church with the victim's parents and that his younger son had been best friends with the victim's younger brother. He said that there was now a rift in the relationship between the two families. He said that Defendant had always been a hard worker and was very remorseful for his actions.

Ken Holmes worked with Defendant at the Cleveland Fire Department. He said that Defendant was the last person he would suspect to do what he did. He described Defendant as a man of good character and said that Defendant was "[o]ne hundred percent" remorseful.

Cleveland Fire Department Lieutenant Joshua Woods testified that he was formerly Defendant's day-to-day supervisor. He said that Defendant "was fantastic as a member of our crew" and "the best ambassador for the city that you could want." He said that Defendant was a hard worker and that he was shocked when Defendant was charged because Defendant's character was always good. He said that his kids loved Defendant and that he trusted Defendant to be around his family.

Brandy Haney said that she taught Defendant in seventh and eighth grades. She said that she had taught close to 2,000 students in her eighteen years of teaching and that, "even if [she] had not seen Defendant or, you know, followed him through the years, he would be one that [she] would always remember for his positivity, his kindness, and even as a teenager just wanting to help others." She said that he was "[a]bsolutely of good character, always wanted to serve others."

Megan Cox said that her fiancé was a good friend of Defendant. She said that her child called Defendant "Uncle Logan." She described Defendant as a man of good character and someone who was "willing to do whatever it took to help other people."

Nelson Goodman said that he had been friends with Defendant since high school. He said Defendant was a hard worker with "a heart for serving others." He said that Defendant had excellent character and that, before this incident, he had never known Defendant to do "anything out of character." He said that Defendant was "absolutely remorseful."

At the conclusion of the sentencing hearing, the trial court made extensive findings of fact and conclusions of law. The trial court stated that it reviewed the numerous letters filed with the court and noted that the letters consistently described Defendant as a man of good character who was always willing to help others. The presentence report showed that Defendant had no prior criminal record and had never used illegal drugs. The Strong-R assessment suggested that Defendant was "a low risk to reoffend with no high or moderate needs" and that Defendant could be supervised "as a minimum risk offender." The court noted that Defendant had completed an associate degree at Cleveland State Community College and had strong family support in the area; Defendant owned his own home and a vehicle. The court found that the offenses did not result from an impulsive act but rather was thought out and planned by Defendant. The court noted that Defendant's claim that he found the key to K.W.'s house on the ground made no sense and that Defendant initially lied to police after the camera was discovered.

The Certificate of Eligibility for Diversion was entered as Exhibit 4. The court found that Defendant was amenable to correction, had no prior criminal history or history of using illegal drugs, had a good social history, had a consistent history of employment, and was trying to start his own concrete business. The court found that there had been no problems with Defendant's conduct since his arrest, that his attitude and demeanor were appropriate, and that multiple people stated or testified about Defendant's being remorseful, although the court noted that Defendant did not express remorse during his sentencing hearing testimony. The court acknowledged that Defendant stated to the presentence report officer that he was "deeply sorry" for his actions. The court found that these factors, as well as Defendant's general reputation and young age, supported a grant of diversion.

The trial court described the circumstances of the offenses as a serious "invasion of privacy" that had "sexual overtones." The court noted that, if Defendant "just wanted to take pictures, [he] could have . . . installed some sort of a camera and watched her drive in and out of her driveway." The court noted that Defendant entered the victim's home and placed a camera in her bathroom "where she's going to be naked in the shower" to "gratify [D]efendant's desire for pleasure and excitement." The court also discussed the Victim Impact Statement, in which K.W. stated that she felt "violated" as a result of the incident and was undergoing continuing mental health treatment; that she felt unsafe in her own home and community; that she stopped attending church for fear of seeing Defendant there;

that friends and reporters frequently questioned her about the incident such that she felt helpless; that she had to hire an attorney to obtain an order of protection against Defendant; that the slow progress of the criminal case was difficult; and that she feared if Defendant was not held accountable, the situation "could escalate." The court found the circumstances of the offenses weighed against a grant of diversion.

The trial court found that Defendant chose not to take prescribed medications for his anxiety and depression and that he was using alcohol to excess when he committed the offenses in this case. The court found that Defendant's physical and mental health weighed against a grant of diversion. The court also found that the "need for deterrence both to you and anyone else who would hear about this case weighs against a grant of diversion." Finally, the court found that a grant of diversion would not serve the ends of justice.

After discussing and considering the principles and purposes of sentencing, mitigating and enhancement factors, and the statistical information provided by the Administrative Office of the Courts, the trial court sentenced Defendant to three years to be served on probation after service of thirty days in jail and denied Defendant's application for judicial diversion.

*Analysis*

Defendant claims that the trial court abused its discretion by denying judicial diversion, arguing that the circumstances of the unlawful photography offense "were not especially offensive of an exaggerated degree" and that there was not substantial evidence supporting the trial court's finding "regarding deterrence" or its finding that "judicial diversion would not serve the public interest." The State argues that the trial court did not abuse its discretion in denying diversion. We agree with the State.

Tennessee Code Annotated section 40-35-313 governs judicial diversion procedure. Upon a finding of guilt, the trial court may place a qualified defendant on probation without entering a judgment of conviction. Tenn. Code Ann. § 40-35-313(a)(1)(A). Once a defendant successfully completes probation, the charge will be dismissed. Tenn. Code Ann. § 40-35-313(a)(2). A defendant is a "qualified defendant" and eligible for judicial diversion if he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; has not been previously convicted of a felony or Class A misdemeanor for which a sentence of confinement has been served; has not been previously granted judicial or pretrial diversion; and is not seeking deferral for a sexual offense, a DUI, certain offenses against elderly or vulnerable adults, or vehicular assault. *See* Tenn. Code Ann. § 40-35-313(a)(1)(B)(i). Defendant was a qualified defendant as defined in Tennessee Code Annotated section 40-35-313(a)(1)(B)(i).

However, being qualified for diversion does not presumptively entitle a defendant to judicial diversion but simply allows the trial court to grant diversion in appropriate cases. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). The defendant bears the burden of proving that he or she is a suitable candidate for judicial diversion. *State v. Baxter*, 868 S.W.2d 679, 681 (Tenn. Crim. App. 1993)); *State v. Gibson*, No. E2007-01990-CCA-R3-CD, 2009 WL 1034770, at *4 (Tenn. Crim. App. Apr. 17, 2009) (citing *State v. Curry*, 988 S.W.2d 153, 157 (Tenn. 1999).

In *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) and in *Parker*, 932 S.W.2d at 958, this court identified the following seven common law factors that the trial court must consider and weigh prior to granting or denying judicial diversion to a qualified defendant:

(a) the accused's amenability to correction;

(b) the circumstances of the offense;

(c) the accused's criminal record;

(d) the accused's social history;

(e) the accused's physical and mental health;

(f) the deterrence value to the accused as well as others; and

(g) whether judicial diversion will serve the interests of the public as well as the accused.

When, as in this case, the record reflects that the trial court considered the *Parker* and *Electroplating* factors, identified which factors were relevant, and made detailed and comprehensive findings on the record explaining its reasons for denying diversion; we apply a presumption of reasonableness and review the judgment for an abuse of discretion. *State v. King*, 432 S.W.3d 316, 327 (Tenn. 2014). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015). We will uphold the denial of diversion "so long as there is any substantial evidence to support the trial court's decision." *King*, 432 S.W.3 at 327.

The trial court found that the factors in favor of diversion were outweighed by the serious circumstances of the offenses; Defendant's invasion of K.W.'s privacy to gratify

his desire for sexual pleasure and excitement; Defendant's choice not to take prescribed mental health medications; Defendant's excessive alcohol use at the time of the incident; and the need to deter similarly situated individuals. The court found that Defendant's sentencing hearing testimony about how he found K.W.'s house key was not credible, and the court noted Defendant's dishonesty with the police when first confronted with the camera. The trial court did not abuse its discretion by denying diversion, and Defendant is not entitled to relief. *Id.* at 327.

## *Conclusion*

In the instant case, the trial court correctly noted that Count 2 merged into Count 1 in the special conditions box of uniform judgment document for Count 2. The judgment for Count 2 did not, however, include the eleven months twenty-nine days sentence imposed by the trial court in Count 2 as required by Tenn. R. Crim. P. 32(e). *See State v. Berry*, 503 S.W.3d 360, 363 (Tenn. 2015). Therefore, we affirm the judgments of the trial court but remand the case for entry of corrected a judgment in Counts 2 reflecting a sentence of eleven months twenty-nine days.

_____
ROBERT L. HOLLOWAY, JR., JUDGE