FILED
DEC 27 2024
Clerk of the Appellate Courts
REc'd By _____

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs December 17, 2024

## STATE OF TENNESSEE v. KEITH LAMAR MARCH

**Appeal from the Criminal Court for Knox County**
**No. 125116   Hector Sanchez, Judge**

---

## No. E2024-00672-CCA-R3-CD

---

The defendant, Keith Lamar March, was convicted by a Knox County Criminal Court jury of unlawful possession of a weapon after having been convicted of a felony crime of violence, failure to drive on the right side of the roadway, and evading arrest. Following a sentencing hearing, the trial court imposed an effective sentence of fourteen years in the Tennessee Department of Correction. On appeal, the defendant argues that the evidence is insufficient to sustain his convictions. Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and D. KELLY THOMAS, JR., S.J., joined.

Richard C. Stooksbury, III, Knoxville, Tennessee, for the appellant, Keith Lamar March.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; and Takisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

As a result of his interaction with deputies from the Knox County Sheriff's Office during the morning hours of January 8, 2023, the defendant was indicted for unlawful possession of a weapon after having been convicted of a felony crime of violence,

possession of drug paraphernalia, driving on a suspended or revoked license,[1] failure to drive on the right side of the roadway, evading arrest, possession of cocaine, and possession of heroin.

The proof at trial showed that on January 8, 2023, Deputy Kaleb Lee was driving on Maryville Pike on his way to work to start his 6:00 a.m. shift when he noticed that a car turning onto Maryville Pike was "about to . . . r[u]n the stop sign." Deputy Lee turned around and began following the vehicle and observed it "cross the double yellow line in the center of the road." "[L]ess than a hundred yards" down the road, the vehicle "crossed the solid white line on the edge of the road which is . . . commonly refer[red] to as the fog line." Deputy Lee initiated his blue lights, and the car pulled over.

Deputy Lee approached the vehicle and observed a "cut straw in the center console." Deputy Lee noted that such item was often used to snort narcotics.[2] The driver of the vehicle, the defendant, seemed "very nervous" and "kind of shaken." The defendant gave Deputy Lee an "identification only" card, rather than a valid driver's license. Deputy Lee asked the defendant to step out of the vehicle and explained he was going to conduct a pat down for weapons. When Deputy Lee patted the defendant's waist area, the defendant "pushed off of the car" and "fled" on foot down Maryville Pike. Deputy Lee chased the defendant, yelling commands for the defendant to stop, but the defendant ignored the commands. Deputy Lee tased the defendant in the back, and the defendant "fell to the ground on his face." Deputy Lee explained that the taser cycle lasted for five seconds, and when it stopped, the defendant "took his hands and placed them back into his waistband." Worried about what the defendant might have in his waistband, Deputy Lee ordered the defendant to show his hands. When the defendant did not comply, Deputy Lee tased him again. According to Deputy Lee, the defendant "would place his hands out during the cycling of the taser, and as soon as it would stop[,] he would continue to try to put his hands back in his waistband." This pattern continued for a total of six taser cycles. By the third taser round, Deputy Lee also drew his weapon, afraid that the defendant might try to hurt him. Around that time, Deputy Lee also called for help on the radio, stating "I need another officer here now." After the sixth taser round, the defendant "complied and kept his hands" visible. Deputy Lee handcuffed the defendant and stood him up. At that point, Deputy Lee found that "a 9mm handgun had slid down into [the defendant's] boxer-briefs."

As Deputy Lee walked the defendant to the patrol car, his partner, Deputy Joshua Bowers arrived at the scene. Deputy Bowers had been on his way to a different call when he heard Deputy Lee "screaming for help" over the radio. Deputy Bowers had never heard

---

[1] The driving on a suspended or revoked license charge was dismissed.

[2] The cut straw was not confiscated, rather Deputy Lee noted that such items were usually disposed of in a controlled environment.

Deputy Lee "that excited on the radio" and "thought that he was either losing a fight or he was fixing to have to kill somebody." Deputy Bowers "gave up on the alarm call" to which he had been dispatched and "drove as fast as [he] possibly could" to Deputy Lee's location. When Deputy Bowers arrived, Deputy Lee was walking the defendant towards the patrol car, holding a gun in his hand and exclaiming, "He tried to get an f'g gun on me."

Upon returning to the patrol car with the defendant, the deputies began to search him. The officers found two bags of what appeared to be drugs in the defendant's pants pocket, one a white powdery substance and the other a brown rock substance. Based on their training and experience, the deputies believed the powdery substance to be cocaine and the rock substance to be heroin. However, no field or lab tests were performed on the drugs. Deputy Bowers thought the drugs had to be of a felony amount before the narcotics division would send the drugs to be tested. Deputy Lee removed the magazine from the gun, finding that it contained nine rounds, and he also found a "round chambered inside the firearm" that was "ready to fire and be used." Deputy Lee "ejected that round, secured it, and sat it on the trunk of [his] patrol car." Deputy Bowers could tell that Deputy Lee was "super amped up," so he "took over" and "ran the gun through our records division to make sure it wasn't stolen." Deputy Bowers learned the gun was not stolen.

While Deputies Lee and Bowers processed the scene, other officers arrived and helped treat the defendant, who had a "large cut on his forehead" from "where he hit the gravel when he was tased." Thereafter, the deputies took the defendant to the hospital and then to the detention facility. Deputy Lee later determined that the defendant had a prior felony for a crime of violence. The parties stipulated at trial that the defendant "had previously been convicted of a felony crime of violence which would have prevented him from lawfully possessing a firearm."

Footage from both deputies' body cameras was played for the jury, starting from when Deputy Lee was walking the defendant back to the patrol car. Deputy Lee thought he had turned on his body camera sooner, after the first time he tased the defendant, but it did not start. Therefore, Deputy Lee turned the camera on when he got back to the patrol car, and no footage was captured of the tasing. Deputy Bowers explained that it took "a long time for [body cameras] to boot" in the morning because "[i]t has a lot of processes that it goes through before you can actually hit the record button." Neither of the officers' patrol cars had an "in-car cruiser cam."

Following the conclusion of the proof, the jury convicted the defendant of unlawful possession of a weapon after having been convicted of a felony crime of violence, failure to drive on the right side of the roadway, and evading arrest. The jury acquitted the defendant of possession of drug paraphernalia, possession of cocaine, and possession of

- 3 -

heroin. The trial court imposed an effective sentence of fourteen years' confinement, and the defendant appealed.

## *Analysis*

On appeal, the defendant argues that the evidence is insufficient to sustain his convictions. The defendant asserts that there was no evidence supporting Deputy Lee's testimony and "*if* the jury needed more proof about the drugs and paraphernalia beyond the mere testimony of a patrol officer, then it stands to reason that a reasonable jury would need videographic evidence to corroborate what Deputy Lee claimed to be the events leading up to [the defendant]'s arrest." The State responds that the defendant's "claims amount to nothing more than a challenge to witness credibility and the weight of the evidence[, and] [the defendant] is not entitled to relief." We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a

convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"A person commits an offense who unlawfully possesses a firearm . . . and . . . [h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon[.]" Tenn. Code Ann. § 39-17-1307(b)(1)(A).

In addition, Tennessee Code Annotated section 55-8-115(a) provides that "[u]pon all roadways of sufficient width, a vehicle shall be driven upon the right half of the roadway" unless one of four exceptions applies: (1) When overtaking and passing another vehicle proceeding in the same direction under the rules governing such movement; (2) When the right half of a roadway is closed to traffic while under construction or repair; (3) Upon a roadway divided into three (3) marked lanes for traffic under the applicable rules thereon; or (4) Upon a roadway designated and signposted for one-way traffic. *Id.*

Moreover, "it is unlawful for any person to intentionally conceal themselves or flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person . . . [k]nows the officer is attempting to arrest the person" or "[h]as been arrested." *Id.* § 39-16-603(a)(1).

In the light most favorable to the State, the evidence shows that Deputy Lee observed the defendant's vehicle "cross the double yellow line in the center of the road," and "less than a hundred yards" down the road, the vehicle "crossed the solid white line on the edge of the road which is . . . commonly refer[red] to as the fog line." Deputy Lee pulled the defendant over and approached the vehicle. Deputy Lee observed an item considered drug paraphernalia in the center console and noted that the defendant appeared "very nervous" and "kind of shaken." After the defendant failed to provide a valid driver's license, Deputy Lee removed the defendant from the vehicle and told the defendant he was going to conduct a pat down for weapons. When Deputy Lee got to the defendant's waist area, the defendant "pushed off of the car" and "fled" on foot. A chase ensued, and after to the defendant's repeated failures to stop, Deputy Lee invoked the use of his taser. The defendant repeatedly tried "to put his hands back in his waistband" in between tasing cycles, but he eventually "complied and kept his hands" visible. Deputy Lee found a 9mm handgun "slid down into [the defendant's] boxer-briefs." The parties stipulated at trial that the defendant "had previously been convicted of a felony crime of violence which would have prevented him from lawfully possessing a firearm." This evidence was sufficient for a rational trier of fact to find that the defendant committed the offenses of unlawful possession of a weapon after having been convicted of a felony crime of violence, failure to drive on the right side of the roadway, and evading arrest.

The defendant's suggestion that the evidence is insufficient because the incident was not captured on Deputy Lee's body camera and Deputy Bowers did not witness the offenses does not entitle the defendant to relief, as those essentially amounts to a challenge to Deputy Lee's credibility which was determined by the jury. *Pappas*, 754 S.W.2d at 623. The defendant is likewise not entitled to relief based on his assertion that "[i]f the [S]tate did not prove beyond a reasonable doubt the allegations of drugs and paraphernalia without corroborating evidence, then neither should a reasonable jury find proof beyond a reasonable doubt" for the other charges. The evidence concerning the drug charges was different: the cut straw was never collected, and the apparent drugs were not tested. Therefore, the jury might not have been convinced of the defendant's guilt without scientific evidence. In any event, even if the verdicts were inconsistent, "inconsistent jury verdicts are not a basis for relief." *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015). "Consistency in verdicts for multiple count indictments is unnecessary. . . . This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." *Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973). The defendant is not entitled to relief.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

s/ J. ROSS DYER
J. ROSS DYER, JUDGE

- 6 -